

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-11-00126-CR
_____

CHAD MICHAEL HAYS, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 196th Judicial District Court
Hunt County, Texas
Trial Court No. 25588

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Carter

O P I N I O N

Chad Michael Hays[1] appeals his conviction for securities fraud.[2]  Chad was charged with intentionally failing to disclose material facts to investors in connection with Chad's offer for sale and sale of interests in two oil wells.  *See* TEX. REV. CIV. STAT. ANN. art. 581-29(C).[3]  After more than $2.5 million was raised for the purpose of drilling oil wells, neither of the proposed wells was ever drilled by this company.  The indictment alleged the fraudulent activities involved more than $100,000.00, making the offense punishable at the first degree felony range. TEX. REV. CIV. STAT. ANN. art. 581-29(C)(4)(c).[4]  Chad was sentenced to twenty-five years' imprisonment.  The instant appeal challenges the sufficiency of the evidence to prove securities fraud in the amount of $100,000.00 or more, and sufficiency of the evidence to establish venue in Hunt County.  We affirm the trial court's judgment.

## I.      Factual Background—Selling Interests in Wells

Chad worked for his father, Mack, in Mack's company, Mack Diamond Energy (MDE); the company purported to be in the business of drilling for oil.  In late 2006 and into 2007, MDE was raising money to drill an oil well in northeast Texas; the well was referred to as the Honey

---

[1]Because there are several members of the Hays family involved in the events leading to the conviction, we will address Hays family members, including  Chad, by their first names.

[2]Chad faced three indictments, all of which were tried in a single proceeding.  The first two indictments charged Chad with multiple counts of (1) selling unregistered securities, and (2) selling securities without being a registered agent or dealer.  *See* TEX. REV. CIV. STAT. ANN. art. 581-29(A), (B).  Those convictions are addressed in our opinions in cause numbers 06-11-00124-CR and 06-11-00125-CR, issued on even date herewith.

[3]*Amended by* Act of May 18, 2011, 82nd Leg., R.S., ch. 523, § 2, 2011 Tex. Sess. Law Serv. 1298, 1299 (West 2011).

[4]A "security" includes "any instrument representing any interest in or under an oil, gas or mining lease, fee or title . . . ."  TEX. REV. CIV. STAT. ANN. art. 581-4(A) (West 2010).  This applies regardless of whether the security is evidenced by a written instrument.  *Id.*

2

Grove Single Well Joint Venture. In 2007, the company also began selling interests in another well, the Mack Diamond Oil Creek Field 2 Joint Venture. At least one witness testified MDE was a family business run by Mack and Chad. Sarah Padilla, MDE's secretary, said that when Mack was not in the office, Chad was in charge. Melody Ford Thompson Hays, Mack's widow, testified Mack and Chad ran MDE.

Mack[5] formed MDE in 2005; he invited his brother, Kevin Hays, to join the fledgling company in May 2005. After about three months, though, Kevin left the company because there was no business being conducted. Kevin returned to MDE in November 2006. By that time, Chad was working for the company. Articles of Organization were filed in October 2005. Of the testifying witnesses, only one, Morris Cates, made his investment during 2006. The other witnesses who testified at trial made their investments between February and September 2007.

The investors who testified at trial all said they expected drilling to commence relatively soon. Witnesses said, based on statements from Chad, and in one case from Mack, they all believed drilling was "imminent"—the investors' expectations were that drilling would be underway anywhere from thirty days to within six months. The investors believed as follows:

- Sarah DeJong thought drilling was "terribly imminent, like a few weeks or something" of her July 3, 2007, investment;

- David Harper believed drilling would be occurring within thirty days of his July 30, 2007, investment;

---

[5]All the witnesses with personal knowledge of Mack described him as a significant alcoholic; his appearances in the office became less and less frequent; he yelled at and berated family and employees. Mack eventually died after falling at home and suffering a head injury; whether alcohol was involved was not said.

3

- Mike Brown thought the drilling would happen "fairly quick," within two to three weeks of his investment made in May 2007—Chad told him within two to three weeks the well would be deep enough to know if it would produce;

- Dwight McGee said Mack told him, before McGee invested in February 2007, the drilling would begin within three months;

- Morris Cates invested in November 2006; he was told on "a couple of occasions" by Chad a drilling rig was "en route" to the well site, and Cates assumed drilling would begin with six months of his investment; and

- Fred Jones (the only investor whose paperwork specifically indicated he was investing in the "second" well, i.e., the MDE Oil Creek Field 2 Joint Venture well invested in September 2007), believed drilling would be happening within a month, based on comments from Chad.

However, drilling, at least as contracted for and anticipated by MDE, never occurred.[6] MDE had a contract with Boom Drilling, an Oklahoma well drilling company, to commence drilling at the beginning of January 2007. In November 2006, MDE's chief financial officer, Don Dean, was very concerned about the amount of money being spent by MDE on salaries and the fact that months had gone by without the beginning of drilling on the well. He contacted Boom Drilling and renegotiated the contract. Dean said the original contract called for Boom Drilling to be paid around $1 million as down payment, then $19,000.00 or $20,000.00 a day to have the drilling rig on site. In December 2006, Dean said it was obvious MDE could not meet that fee, and renegotiated to around $100,000.00 or $150,000.00 initial payment to get a rig to the site; about $50,000.00 when the rig was ready to begin drilling; and then a daily rate of about $12,000.00. Even at these greatly reduced rates, which allowed MDE to get the rig to the site, MDE could not

_____

[6]There were indications during trial that subsequent to MDE's disbanding, another company drilled a producing well on the site.

4

pay for drilling to begin. Even if Boom Drilling were timely paid, no drilling could have been done because MDE did not acquire a drilling permit or a bond from the Railroad Commission, as required, until the end of January or beginning of February 2007.

In January 2007, Boom delivered a drilling rig to the site, after MDE had made the renegotiated down payment. There is conflicting evidence as to why Boom did not begin drilling. Dean testified that Floyd Keefer, MDE's drilling engineer, told Dean MDE would not send Boom's next payment because there were parts on the rig which were not appropriate, pursuant to the parties' contract. However, Dean also testified that Mack told Dean MDE did not have enough money to send a subsequent payment, even if the proper parts were on site.[7] Dean described the company, in the first quarter of 2007, as "not in good financial condition at all." Kevin said that he heard conversations in the office indicating that a payment check to Boom had bounced and that Mack had told Don and Chad MDE did not have the money to pay Boom. Kevin said Dean told him Boom left the site because MDE did not have enough money in escrow to pay Boom; Chad told Kevin that Boom left because they had not been paid, and MDE was being sued by Boom. After reviewing MDE's accounts, Jeff Warsing, investigator for the Texas Securities Board, said that after January 2, 2007, the company never had enough money on hand to pay for the drilling and testing of the well. Through his questioning of the State's witnesses, though, Chad suggested Boom arrived on site with the wrong drilling rig, and this was why drilling never started. However, Kevin testified Boom was to bring one rig, to drill to a

---

[7]Dean added that when he reviewed the company's books, he found hundreds of debit card transactions, apparently charged by Mack, for nonbusiness purchases at such businesses as convenience and grocery stores. When Dean discussed this with Mack, Dean realized that "Mack didn't know the difference [between business and personal checking accounts] and didn't know how to run the company."

5

depth of 3,000 or 3,500 feet, and then another rig would continue the drilling. This plan for rigs to attain different depths was specifically set out in the drilling contract. Warsing testified Boom left the well site because MDE did not have a drilling permit.[8]

At some point, Mack and Chad, as well as at least one other person with MDE, began to offer shares in a second well in an attempt to secure enough funding for the first, unstarted, well (i.e., the Honey Grove Single Well Joint Venture). Kevin refused to make offers to sell this second well interest when the first had not been drilled.[9] Dean warned Mack and Chad not to divert investments received for the second well to the first project. Of the investors who testified at trial, most of them invested in 2007—after Dean had renegotiated the drilling contract in December 2006.[10] However, all but one of the testifying witnesses invested in the Honey Grove well, i.e., the first, undrilled, well.

The expenditure sheet, State's Exhibit 3, was sent to several investors sometime after August 29, 2007; based on the cover letter and testimony from some investors, the expenditure sheet was generated in response to multiple inquiries about MDE's spending and why the well had not been drilled. The expenditure sheet listed several items that were not directly related to the drilling or analysis of the seismic results. The sheet listed $2,530,578.20 in expenditures; it

---

[8]When asked by Chad's attorney how Warsing knew that, Warsing said he "interviewed Tommy Weder." We did not find an explanation of who Weder is in the record. But the contract between Boom and MDE is signed, on behalf of Boom by a person whose name appears to be Tommy Wedey. Padilla testified that representatives of Boom visited the MDE office, one of whom she said was Tommy Weider.

[9]Kevin was fired by Mack, a few weeks after Kevin said he would not sell the second well.

[10]Dwight McGee sent $50,000.00 in February 2007; Mike Brown sent $17,000.00 in May; Sarah DeJong and David Harper sent $68,750.00 and $34,375.00, respectively, in July 2007; and Fred Jones sent $45,000.00 in September 2007.

characterized $1,301,097.76 as related to contracting with the drilling company, equipment, and geological and seismic expenses, among other things. The expenditure sheet listed $176,011.80 for business and office expenses: the office's telephone system; vehicle; construction and repair of the office; insurance; etc. Finally, the sheet claimed $874,863.74 in salaries.

Many of the investors testified they were surprised to see such expenses listed, finding them to be inappropriate or unrelated to their investments of drilling a well (which had not occurred). Warsing testified only $376,403.83 of the expenses listed were legitimately related to researching, testing, and drilling an oil well.

MDE sent potential investors paperwork related to the well projects: there were applications to complete and questionnaires about the investors' suitability or willingness to assume risk. Also included was a "letter" from a John Magee. In this letter, Magee stated in 1989 he had been involved with a well that showed great promise and actually began producing oil and gas. An inexperienced well worker, though, caused a problem with the well and drilling was stopped. Chad referenced this letter in selling well interests, saying that the proposed well would be on or near the site of this "Magee" well. Four of the testifying investors in this case said this Magee letter was instrumental in their decision to invest in the MDE project. However, Magee had been dead since 2006. In the documents Chad supplied to investigators pursuant to their subpoena, the Magee letter was not included. Based on exhibits presented to investors at trial, it appears most, in the MDE documents they received, saw a signed copy of the Magee letter. At least one exhibit, though, contained an unsigned Magee letter. Sarah Padilla, MDE's secretary, testified she saw Chad sign the letter in 2007. Padilla also said that when salespersons

were offering well interests, the Magee letter was held out as important as regards the likelihood of a producing well.

## II.    Sufficiency of the Evidence

### A.    Standard of Review

Chad's appeal first complains the evidence is insufficient to support the jury's verdict of guilty.  In evaluating legal sufficiency, we review all the evidence in the light most favorable to the jury's verdict to determine whether any rational jury could have found the essential elements of the charged offense beyond a reasonable doubt.  *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd).  Our rigorous legal sufficiency review focuses on the quality of the evidence presented.  *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring).  We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

### B.    Fraud in the Sale of Securities

The indictment accused Chad of engaging in fraud in connection with the offer for sale and sale of interests in either of two wells, the Honey Grove Single Well Joint Venture well and/or the Oil Creek Field 2 Joint Venture.  The indictment lists ten investors as victims and the amounts those parties invested.  Several of the listed investors did not testify at trial, but of the

ones who did, their investment values aggregate to more than $100,000.00. The indictment alleged two methods of committing fraud:

> By intentionally failing to disclose that funds invested by previous investors in the Mack Diamond Energy, LLC, Honey Grove Single Well Joint Venture were used for purposes unrelated to the drilling, testing and completion of an oil and/or gas well, said information being material fact; &

> Intentionally failing to disclose that in December 2006, Mack Diamond Energy entered into an agreement with Boom Drilling wherein Boom Drilling was to drill the Honey Grove Single Well Joint Venture well; that Mack Diamond Energy breached its agreement with Boom Drilling by failing to pay Boom Drilling pursuant to the terms of the agreement; and for that reason, the Honey Grove Single Well Joint Venture was not drilled; said information being material fact . . . .

The jury charge limited the number of investors to McGee, Brown, DeJong, Harper, and Jones. The jury was asked to determine if Chad had engaged in fraud, as alleged, in offering to sell interests in Mack Diamond Energy oil wells in the amount of $100,000.00 or more to the five listed investors.

### 1. Identification

First, Chad argues that there is no evidence linking him to the investments of McGee, Brown, or DeJong. He explains that none of them personally met the salesperson and only testified that they were called by someone who identified himself as Chad Hays. None of them identified him and all lived out of the state. No commission checks were shown to be associated with them. Likewise, he cites *United States v. Ross* for the holding that the fact that a person identifies himself or herself on the telephone is not sufficient to permit the jury to infer who the caller is. 321 F.2d 61 (2d Cir. 1963). The State counters that each of these parties testified to

9

conversations with a person identifying himself as Chad Hays after receiving his unsolicited call. Each of them conversed with Chad about MDE's investment opportunities in the oil wells and received a document from MDE designating Chad as a vice-president who oversaw acquisitions of joint ventures and investor capital contributions. The document referenced the projects and indicated they were in Fannin County, Texas. Scott Harper, son of investor David Harper, met Chad and identified him in court. David Brown received a handwritten note from Chad with a confirmation letter from MDE.

Chad's authority, *Ross v. State*, illustrated that while identifying a salesperson by name only is not sufficient, other evidence allows a jury to infer the proper identification. In *Ross*, other evidence included other similar calls, telephone records, and transaction receipts identifying that "24" was associated with Ross.

Here, the son of one of the investors personally identified Chad; Padilla testified that Chad made the solicitation calls; the prospectus sent to the investors identified Chad as a vice-president of MDE overseeing venture capital contributions. The information further stated that the project was located in Fannin County, Texas. This evidence, cumulatively, is sufficient to allow the jury to infer that the defendant, Chad Hays, was the same person who solicited investments from DeJong, Brown, and McGee.

## 2.        Disclosure of the Boom Drilling Contract

Chad argues there is insufficient evidence that he intentionally failed to disclose to investors that MDE breached its contract with Boom Drilling by failing to pay Boom.

We first examine the evidence supporting a conviction for intentionally failing to disclose information about the Boom Drilling contract.[11]  Article 581-29(C) creates an offense where one:

> C.        In connection with the sale, offering for sale or delivery of, the purchase, offer to purchase, invitation of offers to purchase, invitations of offers to sell, or dealing in any other manner in any security or securities, whether or not the transaction or security is exempt under Section 5 or 6 of this Act, directly or indirectly:[12]
>
> . . . .
>
> knowingly make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . . .

TEX. REV. CIV. STAT. ANN. art. 581-29(C)(3) (footnote omitted).  The State alleged that Chad intentionally failed to disclose to investors that MDE entered an agreement with Boom Drilling to have Boom drill the Honey Grove well and that MDE breached that contract by failing to pay Boom; thus, the Honey Grove well did not get drilled; and all of this constituted a material fact.

"[A]n omitted fact is material if there is a substantial likelihood that it would have assumed actual significance in the deliberations of a reasonable investor, in that it would have been viewed by the reasonable investor as significantly altering the total mix of available

---

[11]The statute provides for multiple ways to commit a single offense, so sufficient evidence to show Chad committed either allegation will support the verdict.  *Cf. Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991).

[12]*Amended by* Act of May 18, 2011, 82nd Leg., R.S., ch. 523, § 2, 2011 Tex. Sess. Law Serv. 1298, 1299.

11

information used in deciding whether to invest." *Bridwell v. State*, 804 S.W.2d 900, 904 (Tex. Crim. App. 1991).

The evidence shows Dean renegotiated the contract with Boom in early December 2006. During December 2006 and January 2007, Boom moved a drilling rig on site. Of the six investors who testified, five were supposedly investing in the Honey Grove well. Kevin testified the initial check to Boom bounced and after Boom did not get fully paid, Boom packed their rig and left.

Of the five investors listed in the jury charge, McGee invested $34,375.00 on February 9, 2007; Brown invested $17,000.00 May 21, 2007; DeJong invested $68,750.00 July 2, 2007; Harper invested $34,375.00 July 31, 2007; and Jones invested $45,000.00 September 11, 2007. Most of the investors specifically said it would have affected their decision to invest in the well project had they known that Boom did not drill because it was not paid. Harper testified that he was not told that a drilling rig had been on site and then left without drilling and that he would not have invested had he known this. Brown said that fact was not disclosed to him and that it would have been a "pretty important" consideration in deciding to invest had he known Boom had placed a rig on the site, but not drilled. McGee said that information "would have impacted our decision-making process for sure." Although Jones supposedly was investing in the second well, not the Honey Grove well, he also said he would consider it "very material" had he known Boom had not drilled because their contractual obligations were not satisfied.[13] Based on these

_____

[13]Jones defined "materiality" as follows: "Materiality is what a reasonable investor would believe would be important in making his or her decision on an investment that would be of -- they would influence their decision,

12

comments, and the fact that of the testifying witnesses, four of them were investing, in 2007, in the very well which was supposed to have been drilled the beginning of that year, the fact that Boom did not drill as agreed would be a material fact.

As for whether MDE breached the contract with Boom, Chad relies on evidence, most of which was suggested by Chad through his cross-examination of State's witnesses, that Boom provided the wrong or inadequate drilling equipment, and this was the reason drilling never commenced. He relies on evidence that drilling engineer Floyd Keefer reportedly told Chad that Boom arrived on the site with the wrong equipment. This evidence of what Keefer told Chad was introduced by Chad's attorney cross-examining Investigator Warsing with testimony Keefer apparently made when he testified to the Texas Securities Board. But Keefer did not testify at trial and the transcript of this testimony was not offered at trial. Kevin testified that Boom did not have improper equipment, but first brought in a rig to drill up to 3,500 feet depth in order to get the project started and planned to use another rig to drill up to 15,000 feet. Substantial evidence supported the State's theory that Boom was not paid and therefore moved off the site.

Dean said he renegotiated the contract to substantially lower rates, but that even at those rates, MDE could not meet payments beyond the initial down payment. Kevin said he heard discussions in the office to the effect MDE could not pay Boom; Kevin also testified that a payment check to Boom had bounced; and that Boom left the site because MDE did not have sufficient escrow funds. Dean said Mack told him MDE lacked sufficient funds for a subsequent payment. And Warsing testified that based on his review of MDE's finances, at no time after the

that would be important and fundamental to their decision, as opposed to trivial, nominal amounts that don't matter."

13

beginning of January 2007 did MDE have sufficient funds to pay Boom.[14] This evidence points to a breach by MDE of the drilling contract with Boom.

It appears that the five investors listed in the jury charge were contacted by Chad after Boom left the site. The jury could infer Chad intentionally did not tell those investors about the company's history with Boom. Despite the failure to meet the terms of both the original and renegotiated contracts with Boom, Chad told or allowed investors to believe drilling was about to commence. He was responsible for most of MDE's sales. Kevin said Chad was present in the office when discussions were held about the lack of money to pay Boom; likewise, Padilla said Chad was in a meeting with other members of MDE when representatives of Boom visited the MDE office in the first quarter of 2007. He assured one investor he was " Christian and that he was honest," but there was testimony Chad was in the habit of referring to investors as "pissants." While there was evidence Chad was persistent in calls to potential investors, many said that after they had sent their money, and no drilling occurred, Chad did not return calls (one, Cates, did say Chad always took or returned his calls).

Further instances of Chad's behavior would allow the jury to infer he intentionally did not tell investors about the Boom contract breakdown. Jones, the only testifying investor whose money was earmarked for the second well, questioned Chad about the failure to drill that well, and Jones' inability to find status updates on MDE's website. Jones said Chad had been making the same explanation for "a few months," that MDE was still acquiring final funding. Jones told

---

[14]Even if funds had been available, it appears MDE did not apply for a drilling permit until late January or February 2007. Warsing said that drilling could not begin without a permit and that his investigation showed at least part of the reason for Boom's leaving the site was MDE's lack of permit or bond.

Chad that there must be something wrong in the transaction and that based on Jones' experience in other well investments, "this [was] way too long for a successful offering to take -- to get it completed." Chad "became agitated and indignant" about Jones' questioning; Chad was "pretty upset" and told Jones that Chad would not want Jones in a future investment. Chad refused to return Jones' investment.

Chad contacted Paul West, who was initially interested in Chad's offer to invest in one of the wells.[15] After doing his own research, though, West found MDE's representations of twenty-five years' experience and success in the oil drilling business did not add up. West said that in his first conversations with Chad, Chad was positive and had West interested in investing in the well. Over time, though, Chad's telephone demeanor "went from this tone of positive opportunity to almost a sound of desperation," which concerned West. When West told Chad he would not invest in the venture because "it just wasn't adding up and not working" for West, based on his research, West said Chad grew very angry and called West an "expletive" idiot.

Intent may be inferred from circumstantial evidence such as acts, words, and the conduct of the appellant. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004). In the totality of the circumstances, a rational jury could infer Chad intentionally withheld information about the breached agreement with Boom Drilling and this breach was a material fact.

### 3. Failure to Disclose Use of Funds

The State's indictment also alleged Chad intentionally failed to disclose funds invested by previous investors were used for purposes not related to the drilling, testing, and completion

---

[15]West said he was contacted by Chad in early 2007, but did not state which well project was being offered to him.

of an oil well.  As mentioned above, MDE sent a statement of expenditures to investors.  Of the investors who testified at trial, all[16] said they would not have invested in the well project had they known monies would be applied to the non-well-related expenses detailed in the expenditure sheet.  Even though no well had been drilled, the statement showed that $2,530,578.20 had been spent.  The expenditures included $176,011.80 for business/office expenses, including more than $35,000.00 for building payments, $21,000.00 for building repairs/roof, and $40,000.00 for office repair.  Additionally, $874,863.74 had been spent for payroll, including over $250,000.00 to Mack and $121,000.00 to Chad.

Specifically, on reviewing the expenditure sheet, Susan DeJong testified she thought, "[W]e've been scammed and they spent all the money and almost nothing has to do with drilling a well."  David Harper, although not specifically referencing the expenditure sheet, said he would not have made his investment had he known investor funds would have been used for purchases unrelated to drilling and testing a well.  Mike Brown was "shocked" when he saw the list of expenditures.  Dwight McGee, while acknowledging a startup business would incur some administrative costs, still said he would not have invested had he known investor funds would have been spent for matters not related to drilling and testing.  When Fred Jones saw the expenditure list, he found the spending "very contrary to acceptable practices"; regarding such expenses, he would not have invested "without a very good explanation."

---

[16]Excepting Morris Cates:  Cates was not alleged as a fraud victim in this case, and there was no evidence he received a copy of the statement of expenditures; and he was not questioned, as all other investors were, about his feelings regarding the non-well-related spending.

As for whether Chad intentionally failed to disclose MDE's spending practices, we refer to the summary of events supporting an inference of intent in our discussion of the Boom Drilling matter. Further, there was testimony Chad was deeply involved in the company, as the son of the founder and a vice-president of MDE.[17] Padilla saw Chad preparing the expenditure sheet that was sent to investors. She said Chad was in charge in Mack's absence, and she saw Chad "a few times" looking through papers on Mack's desk. Kevin also described Chad as in charge and "handling the investors" when Mack was out of the office. Mack's wife, Melody, said Chad asked her, as Mack's wife and a signatory on the company's bank account, to close the account and open a new one. There was sufficient evidence to allow a rational jury to infer Chad intentionally withheld information about the company's spending practices from investors.

The expenditure list which was given to the investors in August 2007 makes it clear that investor funds were diverted to salaries, office repairs, and general expenses.

### III. Venue in Hunt County

Chad's second point of error contends there is insufficient evidence in the record to establish proper venue in Hunt County. If no specific venue provision is stated, offenses are properly prosecuted in the county where the offense was committed. TEX. CODE CRIM. PROC. ANN. art. 13.18 (West 2005). Venue is not an element of the offense and need be proved by only a preponderance of the evidence and not beyond a reasonable doubt. *See* TEX. CODE CRIM. PROC. ANN. art. 13.17 (West 2005); *Murphy v. State*, 112 S.W.3d 592, 604 (Tex. Crim. App. 2003). Absent affirmative record evidence showing the contrary, we presume venue to have

_____

[17]To be fair, almost all employees in the sales area were referred to as vice-president. According to Kevin, this was because Mack stated a vice-president did not need a license to sell the well interests.

been proper in the trial court.  TEX. R. APP. P. 44.2(c)(1); *see also State v. Blankenship*, 170 S.W.3d 676, 681 (Tex. App.—Austin 2005, pet. ref'd) ("It is presumed that venue was proved at trial unless disputed at trial or the record affirmatively shows the contrary.").  Since venue was not challenged or disputed at the trial, it is presumed that it was proven.

Further, the application agreements presented by MDE to the investors stated the agreement was performable in Wolfe City, Hunt County, Texas, any disputes or controversies to be litigated in the courts in Hunt County.  We overrule this point of error.

We affirm the judgment of the trial court.


Jack Carter
Justice


Date Submitted:       April 3, 2012
Date Decided:         June 11, 2012

Publish