# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---
## NO. 03-16-00681-CR
---

**Daer Amador, Appellant**

**v.**

**The State of Texas, Appellee**

---
**FROM THE DISTRICT COURT OF HAYS COUNTY, 207TH JUDICIAL DISTRICT**
**NO. CR-14-0460, THE HONORABLE JACK H. ROBISON, JUDGE PRESIDING**
---

---
## NO. 03-16-00682-CR
---

**Daer Amador, Appellant**

**v.**

**The State of Texas, Appellee**

---
**FROM THE DISTRICT COURT OF HAYS COUNTY, 274TH JUDICIAL DISTRICT**
**NO. CR-15-0352, THE HONORABLE JACK H. ROBISON, JUDGE PRESIDING**
---

## MEMORANDUM OPINION

A jury convicted appellant Daer Amador of aggravated robbery, *see* Tex. Penal Code § 29.03(a)(2), and sexual assault of a child, *see id.* § 22.011(a)(2)(A).[1] Appellant elected to have the trial court decide his punishment, *see* Tex. Code Crim. Proc. art. 37.07(2)(b), and the trial judge assessed appellant's punishment, enhanced pursuant to the repeat offender provisions of the Penal Code, *see* Tex. Penal Code § 12.42(b), (c)(1), at confinement for 50 years in the Texas Department of Criminal Justice for each offense. In four points of error, appellant complains about jury-charge error, challenges the sufficiency of the evidence regarding venue, claims the trial court erroneously denied his motion to suppress, and asserts that he suffered ineffective assistance of counsel. We affirm the trial court's judgments of conviction.

## BACKGROUND[2]

The jury heard evidence that A.S., a 15-year-old juvenile, met appellant on Facebook while she was living in a Hays County youth shelter. The first time A.S. met appellant in person was Thanksgiving Day of 2013, approximately one month after they met online. On that day, appellant

---

[1] The record reflects that appellant was also charged with compelling prostitution, *see* Tex. Penal Code § 43.05, but the jury acquitted him of that charge.

[2] Because the parties are familiar with the facts of the case, its procedural history, and the evidence adduced at trial, we provide only a general overview of the facts of the case here. The facts recited pertain mainly to the sexual-assault charge, as the majority of appellant's claims on appeal relate to his sexual-assault conviction. We provide additional facts in the opinion as necessary to advise the parties of the Court's decision and the basic reasons for it. *See* Tex. R. App. P. 47.1, 47.4. The facts recited are taken from the testimony and other evidence presented at trial.

picked A.S. up at a friend's house,[3] and she "hung out" with appellant and his friend, an individual named Eric Cordoba,[4] drinking and doing drugs.

A.S. testified that Martin Torres, a man whom A.S. knew through her mother, had been contacting A.S. seeking to have her arrange a paid sexual encounter for him with another woman. According to A.S., when she informed Torres that she could not make such arrangements, he asked her if she would have sex with him for money. A.S. said that she initially refused, but he continued to call and text her seeking to have sex with her for money. On Thanksgiving Day, when she was with appellant and Cordoba, she shared Torres's proposition with the two men. A.S. testified that Cordoba devised a plan to rob Torres to get money for a hotel room. The plan was to have A.S. agree to meet Torres to have sex in exchange for money, but appellant and Cordoba would interrupt and rob Torres before the sex occurred.

The evidence showed that Torres arrived at the planned location—near a Motel 6 in San Marcos in Hays County, Texas—and A.S. got into his vehicle. A.S. testified that Torres attempted to have sex with her. She said that she resisted, but that he forced himself on her. A.S. explained that appellant and Cordoba then approached Torres's vehicle wearing masks and brandishing guns, and she fled the vehicle. The evidence reflected that appellant and Cordoba

---

[3] The record reflects that by that time A.S. had run away from the Hays County youth shelter and was staying in Round Rock at the house of a 30-year-old female friend.

[4] The record reflects that the last name of appellant's friend was either "Cordoba" or "Cordova." We refer to him as "Cordoba" because that it how the witnesses at trial referred to him.

3

physically assaulted Torres, striking him with a pistol, and stole his belongings.[5]  Appellant, Cordoba, and A.S. then left the scene.

A.S. testified that after they left, she was driving the car when she was pulled over for a traffic stop by San Marcos police.  The officers discovered that A.S. was 15 years old and determined that she was a reported runaway.  A.S. was taken into custody and transported to the Hays County juvenile detention center; appellant and Cordoba were, at that time, released from the scene.  The evidence showed that at the detention center, authorities discovered Torres's belongings in A.S.'s backpack, along with a handgun.  While in detention, A.S. reported to the juvenile authorities that she had been "raped" by Torres.  As part of the investigation of that sexual assault, A.S. was examined by a sexual-assault nurse examiner, who collected evidence from A.S., including a sample from "inside the vaginal wall."  Subsequent DNA testing excluded Torres as a contributor to the DNA sample recovered from A.S.

By that point, appellant had been arrested for the aggravated robbery of Torres.  Robert Elrod, a detective from the San Marcos Police Department, went to the Hays County jail and met with appellant to request a DNA sample.  The detective explained that they were trying to identify DNA recovered from A.S. and knew that appellant had been with her.  Appellant asked the detective, "So, y'all found DNA in her?"  Detective Elrod confirmed that DNA was found inside

_____

[5] Torres, who had already been convicted for his sexual assault of A.S. at the time of trial, testified pursuant to an order of testimonial immunity.  He explained his interaction with A.S. and described the robbery, although he was unable to identify appellant as one of the perpetrators. Torres's stepson also testified, corroborating certain facts about the robbery.  In addition, the neurosurgeon who treated Torres after the robbery testified about the injuries Torres sustained, including a depressed skull fracture.  We omit detailed descriptions of the testimony of these witnesses as it is not relevant to appellant's complaints on appeal.

A.S. Appellant then admitted that he "did have sexual relations, well, intercourse" with A.S. "about two days" before the event with Torres. He then agreed to allow the detective to collect a sample of his DNA. Subsequent Y-STR testing demonstrated that the DNA recovered from the vaginal sample from A.S. was consistent with appellant's DNA profile.[6]

A.S. was compelled to testify at trial pursuant to an order granting testimonial immunity. After describing the events related to the robbery of Torres, she testified that she never had sex with appellant. She explained that appellant's DNA was found inside her because she "put his semen inside of [herself]." After initially refusing to explain how she accomplished that feat, A.S. said that she "jacked [appellant] off" and "put [his semen] on [her] hand and put it in [her] vagina." She further said that she did this while appellant was passed out or asleep. On cross examination, A.S. said that she did it because "she just wanted to get pregnant." A.S.'s testimony reflected that the sexual activity between her and appellant happened at the motel where she, appellant, and Cordoba were staying. She initially indicated that she was uncertain where the motel was located, testifying that it was in Austin or Round Rock and that she "really [did not] remember" where it was. Later, on cross examination, she maintained that it was in Round Rock.

The sexual-assault nurse examiner testified that during the sexual-assault exam (for Torres's sexual assault against her), A.S. indicated that her last consensual sexual encounter was the

---

[6] Specifically, the DNA analyst testified,

The Y-STR profile from the sperm cell fraction of this item is consistent with the Y-STR profile of [appellant]. The selected profile is found in 0 of 5,259 total individuals within the database. In addition, any paternally related male relatives of [appellant] may not be excluded as being the contributor of this male DNA profile.

night before the Torres incident. The nurse examiner conceded that one could insert semen into themselves to become pregnant "if so inclined," but further expressed that A.S. had availed herself of the "plan B" treatment to prevent pregnancy.

Appellant was ultimately indicted for aggravated robbery, compelling prostitution, and sexual assault of a child. The jury found him guilty of aggravated robbery and sexual assault of a child, but not guilty of compelling prostitution. The trial court sentenced appellant to 50 years in prison for each offense, ordering the sentences to be served concurrently.

## DISCUSSION

Appellant raises four points of error complaining about jury-charge error, insufficient evidence regarding venue, the denial of his motion to suppress, and ineffective assistance of counsel.

### Claims Related to Venue

Appellant's first two points of error raise issues concerning venue. In his first point of error, he asserts that the trial court erred by giving an erroneous jury instruction regarding venue. In his second point of error, appellant argues that the State failed to prove venue by a preponderance of the evidence.

Appellant was charged by indictment with sexual assault of a child. Specifically, the indictment alleged that

> [o]n or about the 28th day of November, 2013, in Hays County, Texas, [appellant] did then and there intentionally or knowingly contact or penetrate the female sexual organ of [A.S.], a child who was then and there younger than 17 years of age, with [appellant's] sexual organ[.]

6

In the abstract portion of the court's jury charge, the trial court included a one-paragraph section about venue:

> Venue is not a criminative fact and therefore not an element of the offense. To sustain the allegation of venue, it shall only be necessary to prove by the preponderance of the evidence that by reason of the facts in the case, the county where such prosecution is carried on has venue. Sexual assault may be prosecuted in the county in which it is committed, or in any county through or into which the victim is transported in the course of the sexual assault. If an offense has been committed within the state and it cannot readily be determined within which county or counties the commission took place, trial may be held in the county in which the defendant resides, in the county in which he is apprehended, or in the county to which he is extradited.

Appellant did not object to the charge on the basis of the instructions regarding venue.

These venue instructions incorporated two venue provisions of the Code of Criminal Procedure—article 13.15 and article 13.19. Article 13.15 concerns the appropriate venue for sexual-assault prosecutions and provides, in relevant part:

> Sexual assault may be prosecuted in the county in which it is committed, in the county in which the victim is abducted, or in any county through or into which the victim is transported in the course of the abduction and sexual assault.

Tex. Crim. Proc. Code art. 13.15. Article 13.19 concerns prosecutions for offenses for which venue cannot be determined and provides:

> If an offense has been committed within the state and it cannot readily be determined within which county or counties the commission took place, trial may be held in the county in which the defendant resides, in the county in which he is apprehended, or in the county to which he is extradited.

*Id.* art. 13.19.

We address appellant's challenge to the sufficiency of the evidence concerning venue first, and then address his claim of jury-charge error.

**Evidentiary Sufficiency Regarding Venue**

In his second point of error, appellant contends that the evidence in the record is insufficient to establish that the alleged sexual assault occurred in Hays County, which is where the indictment alleged that the offense occurred.

The allegation that the offense was committed in Hays County is a venue allegation. Venue is not an element of the offense charged. *Fairfield v. State*, 610 S.W.2d 771, 779 (Tex. Crim. App. 1981); *State v. Blankenship*, 170 S.W.3d 676, 681 (Tex. App.—Austin 2005, pet. ref'd); *see Schmutz v. State*, 440 S.W.3d 29, 34 (Tex. Crim. App. 2014) ("As it is not a 'criminative fact,' venue is not an 'element of the offense' under Texas law."). "Venue means the place where the case may be tried." *Blankenship*, 170 S.W.3d at 681; *see Soliz v. State*, 97 S.W.3d 137, 141 (Tex. Crim. App. 2003) ("[Venue] means the county or district in which a court with jurisdiction may hear and determine a case."); *Thomas v. State*, 699 S.W.2d 845, 854 (Tex. Crim. App. 1985) ("'Venue' means the place in which prosecutions are to begin."); *Blankenship*, 170 S.W.3d at 681 ("Venue denotes locality, and its prevailing meaning is the place of trial, the geographical location in which an action or proceeding should be brought to trial.").

The State is required to prove that the prosecution is being brought in the proper venue pursuant to Chapter 13 of the Texas Code of Criminal Procedure. *See Ex parte Watson*, 601 S.W.2d 350, 352 (Tex. Crim. App. 1980); Tex. Code Crim. Proc. art. 13.17. The general rule

provides that "[i]f venue is not specifically stated, the proper county for the prosecution of offenses is that in which the offense was committed." Tex. Code Crim. Proc. art. 13.18. However, special venue statutes, which expand the number of counties in which an offense may be prosecuted, have been enacted.[7] *See id.* arts. 13.01–13.30. These statutes are a "species of codified 'substantial contacts' jurisdiction; thus, for venue to lie, the defendant, his conduct, his victim, or the fruits of his crime must have some relationship to the prosecuting county." *Murphy v. State*, 112 S.W.3d 592, 604 (Tex. Crim. App. 2003) (quoting *Soliz*, 97 S.W.3d at 141). The Legislature has specified the types of contacts that satisfy this "substantial contacts" threshold for various offenses. *Soliz*, 97 S.W.3d at 141. "While some of the special venue statutes expressly apply to identifiable Penal Code offenses, other special venue provisions apply by virtue of the particular facts of the case rather than the specifically charged offense." *Murphy*, 112 S.W.3d at 604. *Compare* Tex. Code Crim. Proc. arts. 13.12 (applicable to false imprisonment and kidnapping prosecution), 13.13 (applicable to prosecution of criminal conspiracy), 13.14 (applicable when prosecuting bigamy) *with id.* arts. 13.01 (applicable to "offenses committed wholly or in part outside this State"), 13.04 (applicable to

---

[7] The Court of Criminal Appeals has explained that these special venue statutes have been enacted for various reasons, such as: (1) the difficulty of proving precisely where the offense was committed, *see, e.g.*, Tex. Code Crim. Proc. art. 13.04 (offenses committed close to county boundaries may be prosecuted in either county); (2) the location where evidence of the crime is found, *see, e.g.*, *id.* art. 13.08 (theft may be prosecuted in county where actor unlawfully obtained property or where he transported it); (3) the effect that a crime may have upon several different counties, *see, e.g.*, *id.* art. 13.02 (forgery may be prosecuted in county where writing was originally forged or in any county in which forged document was used or attempted to be used or where it was deposited for collection, or, if forgery relates to land, in county where land itself is located); or (4) the effect that the actor may have upon various counties, *see, e.g.*, *id.* art. 13.13 (criminal conspiracy may be prosecuted in county in which agreement was made, where it was to be carried out, or where any conspirator performed any act to achieve an object of conspiracy). *Soliz v. State*, 97 S.W.3d 137, 141 (Tex. Crim. App. 2003).

9

"offenses committed on the boundaries of two or more counties, or within four hundred yards thereof"), 13.06 (applicable to offenses committed on rivers or streams), 13.07 (applicable in case in which victim receives injury in one county and dies in another).

Venue in a criminal case need be proven only by a preponderance of the evidence. *Murphy*, 112 S.W.3d at 604; *Fairfield*, 610 S.W.2d at 779; *Dewalt v. State*, 307 S.W.3d 437, 457 (Tex. App.—Austin 2010, pet. ref'd); *Blankenship*, 170 S.W.3d at 681; *see* Tex. Code Crim. Proc. art. 13.17 ("To sustain the allegation of venue, it shall only be necessary to prove by the preponderance of the evidence that by reason of the facts in the case, the county where such prosecution is carried on has venue."). Venue may be proven by circumstantial or direct evidence. *Black v. State*, 645 S.W.2d 789, 790 (Tex. Crim. App. 1983), *overruled on other grounds by Schmutz*, 440 S.W.3d at 37–39; *Stanley v. State*, 471 S.W.2d 72, 77 (Tex. Crim. App. 1971), *vacated in part on other grounds by Stanley v. Texas*, 408 U.S. 939 (1972); *Dewalt*, 307 S.W.3d at 457. In addition, the trier of fact may make reasonable inferences from the evidence to decide the issue of venue. *Dewalt*, 307 S.W.3d at 457; *Thompson v. State*, 244 S.W.3d 357, 362 (Tex. App.—Tyler 2006, pet. dism'd); *Edwards v. State*, 97 S.W.3d 279, 285 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd). Further, "[v]enue will stand if it is sufficient under any one of the venue provisions the jury was instructed upon." *Murphy*, 112 S.W.3d at 605; *accord Pizzo v. State*, No. 03-14-00701-CR, 2017 WL 1046279, at *9 (Tex. App.—Austin Mar. 10, 2017, pet. ref'd) (mem. op., not designated for publication); *Dewalt*, 307 S.W.3d at 457.

On appeal, we presume that venue was proved in the trial court unless it was disputed in the trial court or the record affirmatively shows the contrary. Tex. R. App. P. 44.2(c)(1); *see*

10

*Meraz v. State*, 415 S.W.3d 502, 506 (Tex. App.—San Antonio 2013, pet. ref'd); *Hays v. State*, 370 S.W.3d 775, 785 (Tex. App.—Texarkana 2012, no pet.); *Witt v. State*, 237 S.W.3d 394, 398–400 (Tex. App.—Waco 2007, pet. ref'd); *Blankenship*, 170 S.W.3d at 681. A motion for directed verdict specifically challenging the proof of venue timely raises and preserves the issue for appeal.[8] *Thompson*, 244 S.W.3d at 362 (citing *Black*, 645 S.W.2d at 791); *see* George E. Dix & John M. Schmolesky, 40 *Texas Practice: Criminal Practice and Procedure* § 5:73 (3d ed. 2017) ("If the appellant moved for directed verdict of not guilty when the State rested and included the claim that venue was not shown, that makes venue an issue and precludes the presumption from arising.").

When reviewing whether there is legally sufficient evidence of venue, we view all the evidence in the light most favorable to an affirmative venue finding and determine whether any rational trier of fact could have found by a preponderance of the evidence that venue was proper. *Dewalt*, 307 S.W.3d at 457; *Gabriel v. State*, 290 S.W.3d 426, 435 (Tex. App.—Houston [14th Dist.] 2009, no pet.); *Witt*, 237 S.W.3d at 398–400; *Duvall v. State*, 189 S.W.3d 828, 830 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd); *Vanschoyck v. State*, 189 S.W.3d 333, 336 (Tex. App.—Texarkana 2006, pet. ref'd). If there is evidence establishing venue by a preponderance, we are not authorized to reverse the judgment on sufficiency of the evidence grounds. *Dewalt*, 307 S.W.3d at 457; *Gabriel*, 290 S.W.3d at 436.

---

[8] Appellant sought a directed verdict on the sexual-assault charge, asserting, "There is no evidence, whatsoever, that [appellant] ever touched the female sexual organ of [A.S.] There was some evidence that she touched his. And there is no evidence that it happened in Hays County, Texas." We construe this last assertion as a challenge to the proof of venue sufficient to raise the venue issue to the trial court and preserve this issue for appeal.

11

In this case, article 13.15, the specific venue statute concerning sexual assault, applies to the identifiable Penal Code offense alleged here—sexual assault of a child. In addition, article 13.19, which provides a special rule when venue cannot otherwise be fixed, applies by virtue of the particular facts of this case—the facts that create uncertainty about where the sexual-assault offense occurred, *see* George E. Dix & John M. Schmolesky, 40 *Texas Practice: Criminal Practice and Procedure* § 5:39 (3d ed. 2017) (observing that under article 13.19, "[t]he predicate for placing venue in the county of the defendant's residence or other statutory alternatives is uncertainty concerning where the offense occurred").

To support his position that the evidence was insufficient to support venue in Hays County, appellant points to A.S.'s testimony on cross examination in which she stated that the sexual activity that she and appellant engaged in happened in Round Rock. However, initially, when asked about the location of the Motel 6 where she stayed with appellant, A.S. testified that the motel was "[i]n somewhere around Round Rock or Austin. I basically was on -- I was on Xanax and alcohol. I really don't remember." Only on cross examination did A.S. maintain that the sexual conduct happened in Round Rock. Her statements during her trial testimony concerning where the sexual activity occurred were inconsistent and equivocal. The jury could have disbelieved A.S.'s testimony that appellant engaged in sexual activity with her in Round Rock and instead believed her earlier testimony that she did not remember where the motel was located. *See Clayton v. State*, 235 S.W.3d 772, 778–79 (Tex. Crim. App. 2007) (observing that jury, as exclusive judge of facts, is entitled to weigh and resolve conflicts in evidence and draw reasonable inferences therefrom); *Dewalt*, 307 S.W.3d at 457 (noting that venue may be proven by circumstantial evidence and that

12

trier of fact may make reasonable inferences from evidence to decide issue of venue). The jury could have found A.S.'s later certainty that the motel was in Round Rock to be not credible considering that throughout her testimony A.S. made repeated efforts to protect appellant or minimize his criminal conduct. In fact, her testimony at trial contradicted other statements that she made to juvenile detention officials, police, and in prior trial testimony—to the extent that the prosecutor impeached A.S. with her prior inconsistent statements.[9]

Contrary to appellant's contention, the State was not required to prove that the sexual-assault offense occurred in Hays County. To sustain the allegation of venue, the State's burden was only to prove by a preponderance of the evidence that the county where the offense was prosecuted—Hays County—had venue. *See* Tex. Code Crim. Proc. art. 13.17. Article 13.19 provides that when an offense has been committed within the state but "it cannot readily be determined within which county or counties the commission took place," trial may be held in the county in which the defendant resides, the county where he is apprehended, or the county to which he is extradited. *Id.* art. 13.19. This provision was made a part of the trial court's jury charge in this case. The record reflected that appellant was "apprehended" on the sexual-assault charge in Hays County when he was in the Hays County jail awaiting trial on the aggravated-robbery charge and had been "extradited" to Hays County from the Texas Department of Criminal Justice to face the pending robbery charge.[10] Given the difficulty of determining exactly where the sexual-assault offense

---

[9] The record also reflected that A.S. continued her relationship with appellant after he was charged with the instant offenses, visiting him eight times while he was in jail awaiting trial.

[10] Concerning extradition under article 13.19, one of our sister court of appeals has explained,

13

occurred, a rational jury could have relied on this provision and concluded that venue was proper in Hays County, the county of appellant's apprehension and extradition. *See, e.g.*, *Murphy*, 112 S.W.3d at 605 (given difficulty of determining where capital murder occurred, venue proper in county of appellant's residence); *Witt*, 237 S.W.3d at 398–400 (because evidence showed that appellant sexually assaulted child in unknown Texas counties, venue was proper in county to which he was extradited). Thus, viewed in a light most favorable to an affirmative venue finding, a rational trier of fact could have found by a preponderance of the evidence that venue was proper in Hays County.

Moreover, even assuming arguendo that the evidence was insufficient to support an affirmative venue finding, the failure of proof of venue by the prosecution does not negate the guilt of the accused. *Fairfield*, 610 S.W.2d at 779; *Blankenship*, 170 S.W.3d at 681; *see Schmutz*, 440 S.W.3d at 35 ("Because venue is not an element of the offense, . . . the failure to prove venue does not implicate sufficiency of the evidence, nor does it require acquittal under *Jackson*."). Rather, venue error is non-constitutional and is subject to harm analysis under Texas Rule of Appellate Procedure 44.2(b). *Schmutz*, 440 S.W.3d at 39. Non-constitutional error requires reversal only if

---

"Extradition" is customarily understood as the interstate or international transfer of an alleged criminal to face charges in the receiving jurisdiction. *See Black's Law Dictionary* 623 (8th ed. 2004) (defining "extradition" in pertinent part as "[t]he official surrender of an alleged criminal by one state or nation to another having jurisdiction over the crime charged"); *see also* Tex. Code Crim. Proc. ch. 51 (providing for interstate extradition of fugitives from justice). As used in article 13.19[,] however, the term necessarily refers to the transfer of alleged criminals from one Texas county to another. *See Black's Law Dictionary* 623 (defining "extradite" in pertinent part as the "surrender or deliver[y of] (a fugitive) to another jurisdiction").

*Witt v. State*, 237 S.W.3d 394, 400 (Tex. App.—Waco 2007, pet. ref'd).

14

it affects the substantial rights of the accused. *See* Tex. R. App. P. 44.2(b); *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018); *Barshaw v. State*, 342 S.W.3d 91, 93 (Tex. Crim. App. 2011); *Sandoval v. State*, 409 S.W.3d 259, 287 (Tex. App.—Austin 2013, no pet.). "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *Thomas v. State*, 505 S.W.3d 916, 926 (Tex. Crim. App. 2016) (quoting *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997)). We will not overturn a criminal conviction for non-constitutional error if, after examining the record as a whole, we have fair assurance the error did not influence the jury, or influenced the jury only slightly. *Gonzalez*, 544 S.W.3d at 373; *Barshaw*, 342 S.W.3d at 93; *Sandoval*, 409 S.W.3d at 287.

We first observe that the record in this case demonstrates that both A.S. and appellant had a relationship with Hays County, the prosecuting county. The evidence showed that A.S. resided in Hays County at the youth shelter before she ran away, was apprehended as a runaway in Hays County, and then was detained in the Hays County juvenile detention center. Further, the evidence demonstrated that appellant and A.S. committed the aggravated robbery against Torres in Hays County. In addition, the alleged compelling-prostitution charge against appellant was based on conduct that occurred, in part, in Hays County. Finally, the record reflected that appellant was incarcerated in the Hays County jail, first on the aggravated-robbery charge and later on the compelling-prostitution and sexual-assault charges. Given those connections with Hays County, prosecution of the sexual assault in Hays County was consistent with the purpose underlying the venue statutes. *See Murphy*, 112 S.W.3d at 604; *Soliz*, 97 S.W.3d at 141. The Hays County community had a connection to the prosecution and the individuals involved, and, thus, Hays County

15

jurors had a natural interest in the case. *See Thompson*, 244 S.W.3d at 366 ("Venue rules are intended to ensure that jurors have a natural interest in the case because it touched their community." (citing George E. Dix & Robert O. Dawson, 40 *Texas Practice: Criminal Practice and Procedure* § 2.02 (2001)).

Further, there was no indication in the record that the trial in Hays County was the result of forum shopping or that it particularly inconvenienced or misled appellant, prevented him from presenting a defense, or deprived him of a fair judge or jury. *See Schmutz v. State*, No. 06-12-00059-CR, 2013 WL 1188994, at *3 (Tex. App.—Texarkana Mar. 22, 2013) (mem. op., not designated for publication), *aff'd*, 440 S.W.3d 29 (Tex. Crim. App. 2014); *Thompson*, 244 S.W.3d at 366.

Moreover, at trial the contested issue concerning the sexual assault was not where the offense occurred but whether the offense occurred at all. The evidence in the record supporting the jury's guilty verdict was strong. Appellant admitted to Detective Elrod that he had sexual intercourse with A.S., and appellant's DNA profile matched the DNA evidence recovered from inside A.S.'s vagina during the sexual-assault exam.

Based on the record before us, we have fair assurance that any insufficiency in the evidence concerning venue did not influence the jury, or influenced the jury only slightly. *See Gonzalez*, 544 S.W.3d at 373; *Barshaw*, 342 S.W.3d at 93; *Sandoval*, 409 S.W.3d at 287.

For the above reasons, we overrule appellant's second point of error.

16

**Jury-charge Error**

We review alleged jury-charge error in two steps: first, we determine whether error exists; if so, we then evaluate whether sufficient harm resulted from the error to require reversal. *Arteaga v. State*, 521 S.W.3d 329, 333 (Tex. Crim. App. 2017); *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005). The degree of harm required for reversal depends on whether the jury-charge error was preserved in the trial court. *Marshall v. State*, 479 S.W.3d 840, 843 (Tex. Crim. App. 2016); *see Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g) (setting forth procedure for appellate review of claim of jury-charge error). If the jury-charge error has not been properly preserved by an objection or request for instruction, as it was not here, the error must be "fundamental" and requires reversal only if it was "so egregious and created such harm that the defendant was deprived of a fair and impartial trial." *Marshall*, 479 S.W.3d at 843; *accord Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015); *Almanza*, 686 S.W.2d at 171.

A trial court is statutorily obligated to instruct the jury on the "law applicable to the case." *See* Tex. Code Crim. Proc. art. 36.14; *Arteaga*, 521 S.W.3d at 334. The jury charge should tell the jury what law applies and how it applies to the case. *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007). The trial court's duty to instruct the jury on the "law applicable to the case" exists even when defense counsel fails to object to inclusions or exclusions in the charge. *Vega v. State*, 394 S.W.3d 514, 519 (Tex. Crim. App. 2013); *Taylor v. State*, 332 S.W.3d 483, 486 (Tex. Crim. App. 2011). The trial court is "ultimately responsible for the accuracy of the jury charge and accompanying instructions." *Vega*, 394 S.W.3d at 518 (quoting *Delgado*, 235 S.W.3d at 249); *Taylor*, 332 S.W.3d at 488.

17

In his first point of error, appellant asserts that the trial court's instruction on the venue provision concerning sexual assault was erroneous because it omitted portions of the statutory provision. He further contends that the erroneous instruction "substantially lowered the State's burden of proof, causing [appellant] egregious harm."

The venue statute concerning sexual assault provides that venue lies in the county in which the sexual assault was committed, the county in which the sexual-assault victim was abducted, or "in any county through or into which the victim is transported in the course of the abduction and sexual assault." Tex. Code Crim. Proc. art. 13.15. However, concerning counties involving transportation of the victim, the trial court here instructed the jury that venue lies "in any county through or into which the victim is transported *in the course of the sexual assault*." (Emphasis added). This language omitted reference to the abduction of the victim. Thus, the trial court described counties of transportation in terms of counties through or into which the victim was transported in the course of the sexual assault; rather than in the course of *the abduction and sexual assault*. Appellant maintains that the omission of the abduction language constituted error in the jury charge. We agree.

Having found error in the jury charge, we must next consider whether appellant was harmed by the error. Appellant concedes that he did not object at trial to the instructions in the jury charge concerning venue. Consequently, the jury-charge error was not preserved, and reversal is required only if the error was "fundamental" in that it was "so egregious and created such harm that the defendant was deprived of a fair and impartial trial." *Marshall*, 479 S.W.3d at 843; *Villarreal*, 453 S.W.3d at 433; *Almanza*, 686 S.W.2d at 171; *see also State v. Ambrose*, 487 S.W.3d 587, 595

18

(Tex. Crim. App. 2016) (reaffirming that under precedent of Court of Criminal Appeals, unpreserved jury-charge error does not require new trial unless error causes "egregious harm").

Jury-charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory. *Arteaga*, 521 S.W.3d at 338; *Marshall*, 479 S.W.3d at 843; *Arrington v. State*, 451 S.W.3d 834, 840 (Tex. Crim. App. 2015). "Egregious harm is a 'high and difficult standard' to meet, and such a determination must be 'borne out by the trial record.'" *Villarreal*, 453 S.W.3d at 433 (quoting *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013)); *see Nava v. State*, 415 S.W.3d 289, 298 (Tex. Crim. App. 2013) ("[Egregious harm] is a difficult standard to meet and requires a showing that the defendants were deprived of a fair and impartial trial."). We will not reverse a conviction unless the defendant has suffered "actual rather than theoretical harm." *Villarreal*, 453 S.W.3d at 433; *see Marshall*, 479 S.W.3d at 843 ("[C]ourts are required to examine the relevant portions of the entire record to determine whether appellant suffered actual harm, as opposed to theoretical harm, as a result of the error."); *Cosio v. State*, 353 S.W.3d 766, 777 (Tex. Crim. App. 2011) ("An egregious harm determination must be based on a finding of actual rather than theoretical harm.").

In examining the record to determine whether jury-charge error has resulted in egregious harm, we consider (1) the entirety of the jury charge; (2) the state of the evidence, including the contested issues and weight of probative evidence; (3) the arguments of counsel; and (4) any other relevant information revealed by the trial record as a whole. *Arteaga*, 521 S.W.3d at 338; *Marshall*, 479 S.W.3d at 843; *Villarreal*, 453 S.W.3d at 433; *Almanza*, 686 S.W.2d at 171. The

19

analysis is "fact specific and is done on a 'case-by-case basis.'" *Arrington*, 451 S.W.3d at 840 (quoting *Gelinas v. State*, 398 S.W.3d 703, 710 (Tex. Crim. App. 2013)).

*Entirety of the Jury Charge*

In considering the jury charge as a whole, we observe that the jury-charge instructions concerning venue also included an instruction pursuant to article 13.19 regarding venue when it cannot be determined where the offense occurred.

As we discuss in more detail below, the record contained ample evidence that appellant engaged in sexual intercourse with A.S., although the location where he had sex with her is not entirely clear. Based on the evidence presented, the jurors could have concluded that the sexual assault occurred, but that where it occurred could not be determined. Consequently, the article 13.19 venue provision applied.

Accordingly, we conclude that consideration of the entirety of the jury charge, which included the article 13.19 venue provision applicable to the factual context of this case, weighs against a finding of egregious harm.

*State of the Evidence*

We next consider the state of the evidence, including the contested issues and weight of probative evidence. *See Villarreal*, 453 S.W.3d at 433. Under this factor, "we look to the state of the evidence to determine whether the evidence made it more or less likely that the jury charge caused appellant actual harm." *Arrington*, 451 S.W.3d at 841.

Th record reflects that A.S. told the sexual-assault nurse examiner that her last consensual sexual contact (before the sexual assault Torres perpetrated against her on November 28th) was the night of November 27th at around midnight but she did not indicate where that sexual encounter occurred. During the sexual-assault exam, the nurse examiner obtained evidentiary samples from A.S. Subsequent DNA testing indicated that the Y-STR profile from the sperm sample recovered from "inside the vaginal wall" of A.S. was consistent with appellant's Y-STR profile. Moreover, appellant admitted to the detective that he had "sexual intercourse" with A.S. two days before the incident involving Torres, though he did not indicate where the act occurred. Further, in her testimony, while A.S. denied having sexual intercourse with appellant—in contradiction of appellant's statements—she indicated that the sexual conduct they engaged in happened in a motel that was "in Austin or Round Rock" and expressed that she did not remember where it was located. While she backtracked in her apparent efforts to protect appellant and subsequently stated that the sexual encounter happened in Round Rock, she initially indicated uncertainty about the location of the motel and where the sexual contact occurred.

We also observe that the contested issue at trial was not where the sexual assault occurred but whether it happened at all. The defense theory asserted that appellant never contacted or penetrated A.S.'s female sexual organ at all, let alone with his sexual organ, but that his DNA got inside of A.S. when she masturbated him (while he was unaware) and then put his semen inside of her vagina with her own finger.

However, notwithstanding the defensive theory based on A.S.'s explanation, the record contains ample evidence that appellant engaged in sexual intercourse with A.S.—including

21

appellant's admissions that he had sexual intercourse with her and his DNA inside of her. Because the location of where he had sex with A.S. is not entirely clear, particularly given A.S.'s equivocal testimony, the jurors could have concluded that the sexual assault occurred in a location that could not be determined. Thus, as we noted above, the article 13.19 venue provision applied.

After reviewing the evidence and the contested issues at trial, and given the article 13.19 venue provision included in the jury charge and its applicability to the facts of this case, we conclude that the state of the evidence weighs against a finding of egregious harm.

*Arguments of Counsel*

Under this factor, we consider whether any statements made during the trial by the prosecutor, the defense counsel, or the trial court may have exacerbated or ameliorated the error in the jury charge. *Arrington*, 451 S.W.3d at 844.

Regarding the arguments of counsel, the State briefly discussed the issue of venue, but referred only to the "catchall" provision that applied if "we can't figure out exactly where this sexual assault occurred." The State did not refer to the instruction concerning the sexual-assault venue provision at all; thus, the State did not refer to the erroneous instruction that omitted the language regarding abduction.

Defense counsel's closing argument focused on the failure of the evidence to demonstrate that appellant contacted or penetrated A.S.'s sexual organ with his sexual organ, emphasizing A.S.'s testimony that she masturbated him and inserted the ejaculate inside herself with her finger. Counsel never addressed the issue of venue and never discussed where that sexual activity occurred.

22

We perceive nothing in the closing arguments or other statements by the parties or the trial court during trial that exacerbated the trial court's failure to include the entirety of the statutory language of the sexual-assault venue provision. Neither the State nor defense counsel highlighted or relied on the erroneous jury-charge instruction; neither party erroneously applied (or even discussed) the instruction concerning the sexual-assault venue provision. The arguments of counsel weigh against a finding of egregious harm.

*Other Relevant Information in the Record*

As to the fourth factor, our review of the record has disclosed no other relevant information that requires our consideration in the egregious harm analysis.

*Conclusion Regarding Harm*

After reviewing the record and considering the relevant factors, we hold that the trial court's erroneous instruction concerning the sexual-assault venue provision did not egregiously harm appellant. We overrule appellant's first point of error.

**Denial of Motion to Suppress**

Appellant filed a pretrial motion to suppress seeking to suppress the incriminating statements that he made to Detective Elrod when the detective visited appellant in the jail to request a voluntary sample of appellant's DNA.

The record reflects that while appellant was incarcerated in the Hays County jail awaiting trial for the aggravated robbery against Torres, Detective Elrod met with appellant in the jail for the purpose of requesting a DNA sample. The audio recording of the encounter reflects that

23

the detective introduced himself to appellant and then explicitly told him that he was not there to question appellant about the aggravated-robbery charge. The detective explained that he was "here about [A.S.]." He then discussed the fact that because A.S. had made a report of a sexual assault by Torres, a sexual-assault exam had been conducted "looking for evidence." Detective Elrod further explained that "foreign DNA" was found and that he was "trying to get known samples from people who were with her or may have had sex with her." He stated, "We don't know -- we know that y'all were together."[11] The detective told appellant that they were trying to identify the DNA and that he was there to ask if appellant would consent to giving "a known sample" to the detective. Detective Elrod then explained the process of obtaining the DNA sample (by using buccal swabs) and indicated that the sample would be sent off to DPS to see if it "matched" the sample they had. The following exchange then ensued:

DETECTIVE:     Does that make sense? Any questions on that?

APPELLANT:     Um, yes. So, y'all found DNA in her?

DETECTIVE:     Yes.

APPELLANT:     Ok. Um. Because I did have sexual relations, well, intercourse with her about two days prior to that [night of the robbery] maybe.

---

[11] At the suppression hearing, Detective Elrod said that he did not suspect appellant of having had sex with A.S. when he went to request the DNA sample but knew that appellant had been with A.S. He explained to the trial court that he meant that he knew that appellant had had contact with A.S. because they were involved in the robbery together; he did not mean contact "in a sexual manner."

The detective followed up by asking, "So, you're saying that you did have sex with her two days prior to the event that she's saying happened?" Appellant responded, "Yes, sir." Detective Elrod said, "Ok," and then asked if appellant would be willing to give a DNA sample. Appellant consented, and the detective obtained the sample by buccal swabs. After the collection, the detective asked if appellant "had any questions for [him] that [he] could answer," indicating that he did not know anything about appellant's case. Appellant expressed concerns, saying that he did not know "if he should be worried if [his] DNA pops up since she's got this charge going on." Appellant's next comments are difficult to discern on the recording, but he appears to be asking about what will happen "since his DNA popped up." Detective Elrod explained that he did not know if appellant's DNA had "popped up," and that he was just trying to get a known sample to try to identify the foreign DNA. Appellant then stated, "Cause I know I did have intercourse with her prior to the day after I picked her up."

In his motion to suppress and at the suppression hearing, appellant asserted that the encounter with Detective Elrod was, in reality, a custodial interrogation. Thus, according to appellant, the incriminating statements that he made to the detective were inadmissible because he had been subjected to custodial interrogation without being given the requisite constitutional and statutory warnings in violation of his constitutional rights under *Miranda* and the Fifth Amendment and his statutory rights under article 38.22. Therefore, appellant argued, his statements should be suppressed.

The trial court conducted a hearing on the motion at which Detective Elrod testified and the audio recording of the detective's encounter with appellant at the jail was admitted.

25

Appellant maintained that he was in custody because he was incarcerated in the jail on the pending aggravated-robbery charge and was not free to leave. He further argued that the encounter was an interrogation because the detective's interaction with appellant was likely to elicit an incriminating statement. Relying on *Herrera v. State*, 241 S.W.3d 520 (Tex. Crim. App. 2007), the State asserted that appellant was not in custody for purposes of the sexual assault but only for the aggravated robbery, an unrelated charge. The State further contended that appellant was not interrogated because the detective's only purpose in meeting with appellant was to obtain physical evidence. At the conclusion of the suppression hearing, the trial judge took the case under advisement, indicating that he intended to listen to the audio recording of the encounter again and review the case law provided by the parties. Subsequently, the trial court denied appellant's motion to suppress. The court later issued findings of facts and conclusions of law, in which the trial court concluded that appellant was not in custody for purposes of the encounter with Detective Elrod and that appellant was not subjected to interrogation. Thus, the court concluded that appellant's incriminating statements were admissible notwithstanding the absence of *Miranda* and article 38.22 warnings.

In his third point of error, appellant contends that the trial court erred by admitting his incriminating statements, contending that "it was constitutional error for the trial court not to suppress" the audio recording of the jail encounter.[12] Appellant first challenges the trial court's findings that he was not in custody and that he was not subjected to interrogation and asserts that the

---

[12] Although appellant phrases his claim in terms of an erroneous admission of evidence, he relies on evidence adduced at the suppression hearing, challenges the trial court's subsequent findings, and complains about the trial court's "failure to suppress" this evidence. Therefore, we construe his complaint as a challenge to the trial court's denial of his motion to suppress.

26

trial court erred in concluding that the incriminating statements were not obtained in violation of article 38.22.[13] Appellant also asserts that his Sixth Amendment right to counsel was violated by the encounter with Detective Elrod because he was represented by counsel on the aggravated-robbery charge at the time the detective requested his DNA.

We review a trial court's ruling on a motion to suppress evidence for an abuse of discretion. *Arguellez v. State*, 409 S.W.3d 657, 662 (Tex. Crim. App. 2013); *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006). We apply a bifurcated standard of review, *State v. Rodriguez*, 521 S.W.3d 1, 8 (Tex. Crim. App. 2017); *Weems v. State*, 493 S.W.3d 574, 577 (Tex. Crim. App. 2016), giving almost total deference to a trial court's findings of historical fact and credibility determinations that are supported by the record, but reviewing questions of law de novo, *Furr v. State*, 499 S.W.3d 872, 877 (Tex. Crim. App. 2016); *Weems*, 493 S.W.3d at 577. We view the evidence in the light most favorable to the trial court's ruling, *Furr*, 499 S.W.3d at 877; *State v. Robinson*, 334 S.W.3d 776, 778 (Tex. Crim. App. 2011), and overturn the ruling only if it is arbitrary, unreasonable, or "outside the zone of reasonable disagreement," *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014); *Dixon*, 206 S.W.3d at 590. In our review, "[t]he prevailing party is afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it." *Matthews v. State*, 431 S.W.3d 596, 601 n.5 (Tex. Crim. App. 2014). Further, we will uphold the ruling if it is correct on any theory of law applicable to the case, *Weems*, 493 S.W.3d at 577; *Absalon v. State*, 460 S.W.3d 158, 162 (Tex. Crim. App. 2015), even if the trial judge made the ruling for a wrong reason, *Story,* 445 S.W.3d at 732.

---

[13] Appellant does not re-urge his *Miranda* and Fifth Amendment complaint on appeal.

*Custodial Interrogation*

Appellant first contends that the interview with Detective Elrod at the jail during which the detective requested a sample of his DNA constituted a custodial interrogation and, therefore, absent the requisite statutory warnings, the incriminating statements that he made during the encounter were inadmissible.

The Fifth Amendment privilege against self-incrimination prohibits the government from compelling a criminal suspect to bear witness against himself. *Pecina v. State*, 361 S.W.3d 68, 74–75 (Tex. Crim. App. 2012) (citing U.S. Const. amend. V); *see Miranda v. Arizona*, 384 U.S. 436, 444 (1966). In *Miranda v. Arizona*, the United States Supreme Court crafted safeguards to protect the privilege against self-incrimination in the inherently coercive atmosphere of custodial interrogations. *Pecina*, 361 S.W.3d at 75 (citing *Miranda*, 384 U.S. at 441). Texas has incorporated the requirements of *Miranda* into article 38.22 of the Code of Criminal Procedure, which sets out specific warnings that must be provided to an accused during a custodial interrogation. *See* Tex. Code Crim. Proc. art. 38.22, §§ 2–3. Both *Miranda* and article 38.22 require that the accused be properly admonished of certain constitutional rights in order for any statements "stemming from custodial interrogation" to be admissible as evidence against him. *See Miranda*, 384 U.S. at 444; Tex. Code Crim. Proc. art. 38.22, §§ 2–3.

However, "[t]he warnings required by *Miranda* and article 38.22 are intended to safeguard a person's privilege against self-incrimination *during custodial interrogation*." *Gardner v. State*, 306 S.W.3d 274, 294 (Tex. Crim. App. 2009) (emphasis added); *see Herrera v. State*, 241 S.W.3d 520, 525 (Tex. Crim. App. 2007) (explaining *Miranda* warnings "safeguard an

uncounseled individual's constitutional privilege against self-incrimination during custodial interrogation"). Thus, the warnings set out in *Miranda* and article 38.22 are required only when a person is subjected to "custodial interrogation." *See Miranda*, 384 U.S. at 442–57, 467–79 (warnings apply only to use of statements obtained from suspect during police-initiated "custodial interrogation"); Tex. Code Crim. Proc. art. 38.22, §§ 2–3 (setting out requirements for admissibility of defendant's statement resulting from "custodial interrogation").

Under *Miranda* "custodial interrogation" refers to "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. What constitutes "custodial interrogation" under article 38.22 is the same as it is under *Miranda* and the Fifth Amendment. *Thai Ngoc Nguyen v. State*, 292 S.W.3d 671, 677 n.27 (Tex. Crim. App. 2009); *see Bass v. State*, 723 S.W.2d 687, 691 (Tex. Crim. App. 1986) (court's construction of "custodial interrogation" for purposes of article 38.22 was consistent with meaning of "custodial interrogation" under Fifth Amendment). Thus, the concerns raised by a failure to comply with *Miranda* or article 38.22 only arise when the individual is subject to both (1) custody by a law enforcement officer and (2) an interrogation. *See Miranda*, 384 U.S. at 444; Tex. Code Crim. Proc. art. 38.22, §§ 2–3. The threshold issue in this case, then, is whether the interview during which Detective Elrod requested a sample of appellant's DNA amounted to a custodial interrogation.

In denying appellant's motion to suppress, the trial court found that appellant was not in custody when Detective Elrod asked for his DNA sample and, further, that the detective's request for a DNA sample did not subject appellant to interrogation. Appellant challenges both of these findings.

A person is in "custody" when he is placed under arrest or if, under all of the objective circumstances, a reasonable person would believe that his freedom of movement has been restricted to the degree associated with a formal arrest. *State v. Saenz*, 411 S.W.3d 488, 496 (Tex. Crim. App. 2013) (citing *Stansbury v. California*, 511 U.S. 318 (1994)); *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996). At least four general situations may constitute custody: (1) the suspect is physically deprived of his or her freedom of action in any significant way, (2) a law enforcement officer tells the suspect that he or she cannot leave, (3) law enforcement officers create a situation that would lead a reasonable person to believe that his or her freedom of movement has been significantly restricted, and (4) there is probable cause to arrest and law enforcement officers do not tell the suspect that he or she is free to leave. *Saenz*, 411 S.W.3d at 496; *Dowthitt*, 931 S.W.2d at 255. "We evaluate whether a person has been detained to the degree associated with arrest on an ad hoc, or case-by-case, basis." *State v. Ortiz*, 382 S.W.3d 367, 372 (Tex. Crim. App. 2012); *accord Dowthitt*, 931 S.W.2d at 255. In making a custody determination, the primary question is whether a reasonable person would perceive the detention to be a restraint on his or her movement comparable to formal arrest, given all the objective circumstances. *Ortiz*, 382 S.W.3d at 372 (citing *Berkemer v. McCarty*, 468 U.S. 420, 441 (1984)); *see Stansbury*, 511 U.S. at 323; *see also Herrera*, 241 S.W.3d at 532 ("We evaluate 'custody' 'on an ad hoc basis, after

considering all of the (objective) circumstances' and apply the 'reasonable person' standard." (quoting *Dowthitt*, 931 S.W.2d at 254–55)). We look only to the objective factors surrounding the detention; the subjective beliefs of the detaining officer or person being questioned are not included in the calculation of whether a person is in custody. *Ortiz*, 382 S.W.3d at 372–73; *Dowthitt*, 931 S.W.2d at 255; *see Stansbury*, 511 U.S. at 323.

Appellant argues that he was in custody at the time he met with Detective Elrod and the detective sought his DNA sample because he was not free to leave as he was incarcerated in the jail. In response, the State argues, as it did at the suppression hearing, that appellant was not in "custody" at the time he spoke with Detective Elrod. Despite the fact that appellant was incarcerated in the jail at the time of the encounter, the State's argument is not unfounded. The Court of Criminal Appeals has distinguished custody in the *Miranda* sense from its literal meaning, and held that the interview of a jail inmate is not per se a custodial interrogation. *Herrera*, 241 S.W.3d at 527–32; *see id.* at 532 (refusing to equate incarceration with "custody" for purposes of *Miranda* when inmate is questioned by state agent about offense unrelated to inmate's incarceration); *see also Howes v. Fields*, 565 U.S. 499, 508–09 (2012) ("As used in our *Miranda* case law, 'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion."). Rather, a court should look to a number of factors to determine whether a prison inmate is in custody, including (1) the language used to summon the inmate, (2) the physical setting of the interrogation, (3) the extent to which the inmate is confronted with evidence of his or her guilt, (4) the additional pressure exerted to detain the inmate or the change in the surroundings of the inmate which results in an added imposition on the inmate's freedom of movement, and (5) the

31

inmate's freedom to leave the interview and the purpose, place, and length of the questioning. *Herrera*, 241 S.W.3d at 532; *Fields*, 565 U.S. at 514 ("When a prisoner is questioned, the determination of custody should focus on all of the features of the interrogation. These include the language that is used in summoning the prisoner to the interview and the manner in which the interrogation is conducted.").

The record does not reflect the manner in which appellant was summoned to the meeting with Detective Elrod. The detective testified that he did not know what language the jailors used to bring him to the room where the encounter took place or what appellant was told about the meeting. According to Detective Elrod's testimony, the room where they met was the former "DWI room," which measured approximately six by ten feet and had a door with a small window. The detective testified that the meeting lasted "five to ten minutes." The audio recording of the encounter demonstrates that the entire encounter lasted just under six minutes.[14] The record does not indicate that appellant was handcuffed or in any way physically restrained, although the meeting did occur in the jail facility. Detective Elrod explained that the door to the room was not locked and testified that appellant was free to end the meeting with him, did not have to meet with him, and did not have to give the DNA sample. He indicated that appellant could have "just got[ten] up and walked out," although he (the detective) would have had to let the jailors know so they could "take [appellant] back to wherever they're housing him." The detective stated that he did not, at any time during the

---

[14] Approximately two minutes and 20 seconds into the encounter appellant agreed to give his DNA sample; the collection took less than two minutes; the final exchange lasted approximately one and a half minutes; the detective left the room five minutes and 50 seconds after the encounter began.

encounter, confront appellant with any evidence or statement related to the aggravated robbery. He testified that his sole purpose for meeting with appellant was to seek physical evidence, not to get any testimonial statements or to interview appellant.

The trial court made the following findings relevant to the issue of custody:

- The Court finds that defendant, at the time of the oral statements, was not in-custody [sic] for the offense of sexual assault of a child, but that he was in a Hays County jail charged with aggravated robbery.

- The Court further finds that the defendant's meeting with Detective Elrod was not inherently coercive.

- The Court finds that the defendant was told that he did not have to speak to Detective Elrod or provide him with his buccal DNA swab sample.

- The Court finds that, at the time of the meeting with Detective Elrod, the defendant was not incarcerated for the sexual assault of A.S. The defendant was incarcerated for the aggravated robbery of Martin Torres. The sexual assault of a child is a separate and distinct offense from the offense for which the defendant was incarcerated at the time he made the statements to Detective Elrod.

- The Court finds that Detective Elrod did not confront the defendant with evidence of his guilt in the aggravated robbery.

- The Court also finds that Detective Elrod did not confront the defendant with evidence of guilt concerning the sexual assault of A.S.

- The Court fails to find that any additional pressure was exerted on the defendant or that the defendant was un[a]ware he could end the meeting at any time.

These findings concern some, but not all, of the factors we are to consider in determining custody of an incarcerated person for purposes of *Miranda* and article 38.22. These findings are supported by the record and support the trial court's conclusion that appellant was not in custody at the time he made his incriminating statements to Detective Elrod.

33

Furthermore, even assuming arguendo that appellant was in custody when he met with Detective Elrod, the question remains whether the interview during which the detective requested a voluntary sample of appellant's DNA qualified as an "interrogation" under *Miranda* and article 38.22.

When a person is in custody, "the *Miranda* safeguards come into play whenever [that person] is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980). Thus, in the context of *Miranda* (and therefore article 38.22), interrogation "refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.*; *accord State v. Cruz*, 461 S.W.3d 531, 536 & n.15 (Tex. Crim. App. 2015); *Alford v. State*, 358 S.W.3d 647, 653 (Tex. Crim. App. 2012); *see also United States v. Briggs*, 273 F.3d 737, 741 (7th Cir. 2001) (explaining that "not all direct questions constitute 'interrogation'" and that only questions that are reasonably likely to elicit incriminating response from suspect are improper without administration of *Miranda* warnings).

Appellant contends that the detective's request for a voluntary DNA sample was intended to elicit an incriminating response because of comments the detective made during his explanation of why he was requesting a DNA sample—that police were "trying to get known samples from people who were with [A.S.] or may have had sex with her." However, according to Detective Elrod, he met with appellant for the sole purpose of requesting a voluntary DNA sample. He explained that the purpose of obtaining the sample was to identify foreign DNA found during A.S.'s sexual-assault exam. He testified that he had no reason at that time to suspect that appellant

34

had had sexual intercourse with A.S., and only knew that appellant had been in A.S.'s company because the two had robbed Torres together. The record reflects that the detective did not ask appellant any questions beyond confirming that appellant understood what the detective was requesting and the sample-collection process. He did not ask any questions unrelated to the DNA request until after appellant voluntarily made incriminating statements.

In its written findings, the trial court explicitly found Detective Elrod to be credible and further found "that Detective Elrod did not question the defendant in an effort to elicit an incriminating response." The record—including the detective's credible testimony and the audio recording of the encounter—supports the court's finding. These findings support the trial court's conclusion that Detective Elrod did not interrogate appellant when he met with appellant to request the DNA sample.

Moreover, police practices "seek[ing] only physical evidence, not testimonial confessions of guilt" are excluded from the scope of incriminating responses. *Jones v. State*, 795 S.W.2d 171, 175 (Tex. Crim. App. 1990); *Martinez-Hernandez v. State*, 468 S.W.3d 748, 757-58 (Tex. App.—San Antonio 2015, no pet.); *see Soni v. State*, No. 03-96-00086-CR, 1997 WL 124139, at *2 (Tex. App.—Austin Mar. 20, 1997, no pet.) (mem. op., not designated for publication) ("The constitutional right [against self-incrimination] extends, however, only to testimonial evidence and does not encompass purely physical evidence or evidence of physical characteristics."). "The United States Supreme Court has excluded several police practices from the scope of the self-incrimination privilege because they seek only physical evidence, not testimonial confessions of guilt." *Jones*, 795 S.W.2d at 175; *see Schmerber v. California*, 384 U.S. 757, 764

(1966) (Fifth Amendment privilege against self-incrimination "is a bar against compelling 'communications' or 'testimony'" but does not bar "that compulsion which makes a suspect or accused the source of 'real or physical evidence'"); *see, e.g.*, *United States v. Dionisio*, 410 U.S. 1, 7 (1973) (voice exemplars may be compelled without offending the Fifth Amendment privilege); *Gilbert v. California*, 388 U.S. 263, 266 (1967) (handwriting samples may be taken from unwilling suspect without violating self-incrimination privilege); *Schmerber*, 384 U.S. at 761–65 (extraction and chemical analysis of blood sample did not violate Fifth Amendment privilege against self-incrimination); *Jones*, 795 S.W.2d at 175 (sobriety test was merely another example of collection of physical evidence, both visual and aural, and did not violate privilege against self-incrimination).

Here, the trial court found that "Detective Elrod asked the defendant if he would agree to give a buccal swab DNA sample" and that "a known DNA buccal swab is physical evidence." These findings, supported by the record, support the trial court's conclusion that Detective Elrod did not interrogate appellant when he met with appellant to request the DNA sample but only sought "physical evidence," which is excluded from the scope of incriminating responses.

Reviewing the trial court's ruling under the applicable standard of review, we agree with the trial court's conclusion that appellant was not in custody. We further agree with the trial court's conclusion that there was no interrogation because the detective's request for a voluntary DNA sample was not reasonably likely to elicit an incriminating response, and, more importantly, the detective sought only physical evidence not protected by the Fifth Amendment privilege against self-incrimination that is embodied in article 38.22.

The defendant bears the burden of proving that a statement was the product of a custodial interrogation. *Gardner*, 306 S.W.3d at 294; *Herrera*, 241 S.W.3d at 526; *Wilkerson v. State*, 173 S.W.3d 521, 532 (Tex. Crim. App. 2005). We conclude that appellant failed to meet that burden. Because appellant's statement did not stem from "custodial interrogation," the lack of *Miranda* and article 38.22 warnings did not require the suppression of appellant's incriminating statements. Accordingly, the trial court did not abuse its discretion by denying the motion to suppress on this basis.

### Sixth Amendment Right to Counsel

Appellant next contends that his incriminating statements should have been suppressed because his Sixth Amendment right to counsel was violated because he was represented by counsel on the aggravated-robbery charge at the time Detective Elrod met with him to request a DNA sample.

To preserve error for appellate review, a party must timely object and state the grounds for the objection with enough specificity to make the trial judge aware of the complaint, unless the specific grounds were apparent from the context. Tex. R. App. P. 33.1(a)(1)(A); *see Thomas*, 505 S.W.3d at 924; *Yazdchi v. State*, 428 S.W.3d 831, 844 (Tex. Crim. App. 2014). While no "magic words" or citation to specific statutes or rules is required to preserve a complaint for appeal, a party must convey the substance of the complaint to the trial court clearly enough to provide the judge and the opposing party an opportunity to address and, if necessary, correct the purported error. *Ex parte Marascio*, 471 S.W.3d 832, 842 (Tex. Crim. App. 2015); *Pena v. State*, 353 S.W.3d 797, 807 (Tex. Crim. App. 2011). The record must make it clear that both the trial court

and the opposing party understood the legal basis for the complaint. *Thomas v. State*, 408 S.W.3d 877, 884 (Tex. Crim. App. 2013); *see Pena*, 353 S.W.3d at 807. Further, the complaint on appeal must comport with the specific objection made at trial or error has not been preserved. *Thomas*, 505 S.W.3d at 924; *Goff v. State*, 931 S.W.2d 537, 551 (Tex. Crim. App. 1996); *see also Yazdchi,* 428 S.W.3d at 844.

A motion to suppress is a specialized objection to the admissibility of evidence. *See Black v. State*, 362 S.W.3d 626, 633 (Tex. Crim. App. 2012); *Galitz v. State*, 617 S.W.2d 949, 952 n.10 (Tex. Crim. App. 1981); *Moore v. State*, No. 03-13-00792-CR, 2016 WL 3361477, at *3 (Tex. App.—Austin June 9, 2016, no pet.) (mem. op., not designated for publication); *Thomas v. State*, 482 S.W.3d 235, 240 (Tex. App.—Eastland 2015, no pet.); *Moreno v. State*, 409 S.W.3d 723, 727 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd). As such, a motion to suppress must meet all of the requirements of an objection, including that it be both timely and sufficiently specific to inform the trial court of the complaint. *Moore*, 2016 WL 3361477, at *3; *Thomas*, 482 S.W.3d at 240; *Krause v. State*, 243 S.W.3d 95, 102 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd); *Johnson v. State*, 171 S.W.3d 643, 647 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd); *see* Tex. R. App. P. 33.1(a).

We note that appellant did assert in his motion to suppress that his statements "were obtained in violation of his rights under the Fifth, Sixth, and 14th [sic] Amendments to the United States Constitution; and Article I, Sections 10 and 19 of the Texas Constitution." In addition, at the suppression hearing, in introductory remarks, appellant's counsel told the trial court,

When [appellant] was in custody in the Hays County Jail on the robbery charge, he -- and had already been represented by counsel at pretrial motions -- I mean, at pretrial hearings on that case, Detective Elrod went to the Hays County Jail and asked for a consent to obtain a DNA sample.

. . .

The -- the rights that we assert have been violated are the Fifth Amendment right against self-incrimination, the Fifth Amendment right to counsel, as well -- to have counsel present during interrogation -- custodial interrogation, as well as the Sixth Amendment right to counsel whenever a charge has been initiated.

. . .

And then, of course, we're going to argue that it also violated the applicable provisions of the Texas Constitution.

However, "a general or imprecise objection will not preserve error for appeal unless 'the legal basis for the objection is *obvious* to the court and to opposing counsel.'" *Vasquez v. State*, 483 S.W.3d 550, 554 (Tex. Crim. App. 2016) (quoting *Buchanan v. State*, 207 S.W.3d 772, 775 (Tex. Crim. App. 2006)) (emphasis in original).  It is not obvious from appellant's global assertion of a Sixth Amendment violation in the written motion that appellant was claiming that his right to counsel was purportedly violated because he was represented by counsel on the unrelated aggravated-robbery charge when Detective Elrod requested a voluntary DNA sample.  Further, at the suppression hearing, appellant failed to complain about being asked to give a DNA sample while he had counsel representing him on a separate unrelated charge.  Instead, he simply asserted that his statements were inadmissible because of a violation of "the Sixth Amendment right to counsel whenever a charge has been initiated."  Again, it is not obvious from this assertion that he was

39

claiming that his Sixth Amendment right to counsel was violated because he was represented by counsel on the aggravated-robbery charge when Detective Elrod requested a voluntary DNA sample.

Appellant never articulated to the trial court how his Sixth Amendment right to counsel was violated, but instead merely made global assertions. Although the courts "have long eschewed hyper-technical requirements for error preservation," the party must "let the trial court know what he wants and why he feels himself entitled to it clearly enough for the judge to understand him." *Vasquez*, 483 S.W.3d at 554; *see Everitt v. State*, 407 S.W.3d 259, 263 (Tex. Crim. App. 2013) ("[A]ll the party has to do to avoid the forfeiture of a complaint on appeal is to let the trial judge know what he wants, why he thinks he is entitled to it, and to do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it." (quoting *Layton v. State*, 280 S.W.3d 235, 239 (Tex. Crim. App. 2009)). Appellant's global assertions—in both his pretrial motion to suppress and at the suppression hearing—were not sufficiently specific to apprise the trial court (or the State) of his complaint or to preserve the argument he now makes on appeal. *See Swain v. State*, 181 S.W.3d 359, 365 (Tex. Crim. App. 2005) (observing that arguments in written motion to suppress and assertions at suppression hearing "were global in nature" and "contained little more than citations to constitutional and statutory provisions" and were not sufficiently specific to preserve arguments made on appeal). None of the trial court's findings of fact or conclusions of law relate to the issue of a Sixth Amendment right-to-counsel violation. This omission indicates that the trial court was not aware of this complaint. Furthermore, other than counsel's initial global remarks, the entirety of the suppression hearing, including closing arguments to the court, focused on appellant's contention that his

incriminating statements to Detective Elrod were the result of a custodial interrogation and, absent *Miranda* and article 38.22 warnings, were inadmissible.[15]

Based on the record before us, we conclude that appellant did not preserve his complaint concerning a Sixth Amendment right-to-counsel violation. *See Vasquez*, 483 S.W.3d at 554; *Swain*, 181 S.W.3d at 365. Preservation of error is a systemic requirement on appeal. *Darcy v. State*, 488 S.W.3d 325, 327 (Tex. Crim. App. 2016); *Bekendam v. State*, 441 S.W.3d 295, 299 (Tex. Crim. App. 2014). A reviewing court should not address the merits of an issue that has not been preserved for appeal. *Blackshear v. State*, 385 S.W.3d 589, 590 (Tex. Crim. App. 2012); *Wilson v. State*, 311 S.W.3d 452, 473–74 (Tex. Crim. App. 2010).

For the above reasons, we overrule appellant's third point of error complaining about the denial of his motion to suppress.

---

[15] At the suppression hearing, appellant offered no testimony or other evidence in support of this alleged Sixth Amendment violation. The only evidence concerning whether appellant had an attorney was Detective Elrod's testimony, during cross examination, that he did not know "if [appellant] had an attorney or not."

We observe that the clerk's record in the aggravated-robbery case contains a letter of representation addressed to the trial judge. However, this letter was not referenced at the hearing, nor was it offered as evidence.

Furthermore, while the Sixth Amendment right to counsel attaches after adversarial judicial proceedings have begun and extends to all "critical stages" of criminal proceedings, including interrogation, *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009), the right is limited; it is "offense specific" and does not extend to all future prosecutions, *Texas v. Cobb*, 532 U.S. 162, 167–68 (2001); *see McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991) ("The Sixth Amendment right, however, is offense specific. It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced[.]"). Appellant was not charged with sexual assault at the time Detective Elrod requested his DNA; thus, his Sixth Amendment right to counsel had not attached for that crime.

**Ineffective Assistance of Counsel**

At trial appellant was represented by three attorneys. In his fourth point of error, appellant contends that his trial counsel rendered ineffective assistance at trial because: (1) counsel failed to object to the erroneous sexual-assault venue instruction in the jury charge, (2) failed to publish a defense exhibit during trial or mention it in closing argument, (3) one of his trial attorneys failed to have copies of "key evidence" at trial, (4) one of his trial attorneys had a conflict of interest because of a prior professional relationship with A.S., and (5) one of his trial attorneys was inexperienced.

To establish ineffective assistance of counsel, an appellant must demonstrate by a preponderance of the evidence both deficient performance by counsel and prejudice suffered by the defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Nava*, 415 S.W.3d at 307. The appellant must first demonstrate that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 U.S. at 687–88; *Nava*, 415 S.W.3d at 307. The appellant must then show the existence of a reasonable probability—one sufficient to undermine confidence in the outcome—that the result of the proceeding would have been different absent counsel's deficient performance. *Strickland*, 466 U.S. at 694; *Nava*, 415 S.W.3d at 308. Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim. *Strickland*, 466 U.S. at 700; *see Perez v. State*, 310 S.W.3d 890, 893 (Tex. Crim. App. 2010).

Appellate review of counsel's representation is highly deferential; we must "indulge in a strong presumption that counsel's conduct was *not* deficient." *Nava*, 415 S.W.3d at 307–08;

*see Strickland*, 466 U.S. at 686. To rebut that presumption, a claim of ineffective assistance must be "firmly founded in the record," and "the record must affirmatively demonstrate" the meritorious nature of the claim. *See Menefield v. State*, 363 S.W.3d 591, 592 (Tex. Crim. App. 2012); *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005). Rarely will the trial record by itself be sufficient to demonstrate an ineffective-assistance claim. *Nava*, 415 S.W.3d at 308. If trial counsel has not been afforded the opportunity to explain the reasons for his conduct, we will not find him to be deficient unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Id.* (quoting *Menefield*, 363 S.W.3d at 593); *Goodspeed*, 187 S.W.3d at 392.

In this case, appellant filed a motion for new trial. However, he did not raise a claim of ineffective assistance of counsel in the motion. Thus, concerning appellant's first three allegations of deficient performance (the alleged failures of counsel), the record is silent as to why trial counsel failed to act in the manner that appellant now complains about on appeal. Consequently, the record before this Court is not sufficiently developed to allow us to evaluate those purported failures to act because "[n]either [his] counsel nor the State have been given an opportunity to respond to" the claims of ineffectiveness. *See Menefield*, 363 S.W.3d at 593. The record is silent as to whether there was a strategic reason for counsels' conduct or what the particular strategy was. Appellant's repeated assertions that "there is absolutely no plausible strategy" for the alleged failures are mere speculation. Such speculation does not constitute a demonstration, founded in the record, that no reasonable trial strategy existed. *See Villa v. State*, 417 S.W.3d 455, 463 (Tex. Crim. App. 2013) ("[C]ounsel's alleged deficiency must be affirmatively demonstrated in the trial record."); *Lopez v.*

*State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011) ("[C]ounsel's deficiency must be affirmatively demonstrated in the trial record; the court must not engage in retrospective speculation.").

Appellant's trial attorneys were not afforded an opportunity to explain their reasons for the complained-of conduct. Absent record evidence regarding counsels' strategy or reasoning, we will presume they exercised reasonable professional judgment. *See Hill v. State*, 303 S.W.3d 863, 879 (Tex. App.—Fort Worth 2009, pet. ref'd); *Poole v. State*, 974 S.W.2d 892, 902 (Tex. App.—Austin 1998, pet. ref'd); *see also Lopez*, 343 S.W.3d at 143. Appellant has failed to rebut the strong presumption of reasonable assistance because without explanation for trial counsels' decisions, the complained-of conduct does not compel a conclusion that their performance was deficient. We cannot say that "no reasonable trial strategy could justify" or explain their decision to engage in the complained-of conduct. *See Lopez*, 343 S.W.3d at 143. Nor can we conclude that their conduct was "so outrageous that no competent attorney would have engaged in it." *See Menefield*, 363 S.W.3d at 592; *see also Ex parte Jimenez*, 364 S.W.3d 866, 883 (Tex. Crim. App. 2012) ("The mere fact that another attorney might have pursued a different tactic at trial does not suffice to prove a claim of ineffective assistance of counsel."). Accordingly, on this record, we conclude that appellant has failed to demonstrate deficient performance on the part of his trial counsel regarding the complained-of failures. *See Frangias v. State*, 450 S.W.3d 125, 136 (Tex. Crim. App. 2013) ("[U]nless there is a record sufficient to demonstrate that counsel's conduct was not the product of an informed strategic or tactical decision, a reviewing court should presume that trial counsel's performance was constitutionally adequate 'unless the challenged conduct was so

outrageous that no competent attorney would have engaged in it.'") (quoting *Goodspeed*, 187 S.W.3d at 392).

Concerning appellant's fourth allegation of deficient performance, the purported conflict of interest, appellant fails to demonstrate how a prior professional relationship with A.S. created an actual conflict of interest with appellant. The record reflects that one of appellant's trial attorneys is also a nurse and that A.S. was her former patient. During cross examination of A.S., defense counsel attempted to question A.S. concerning information, apparently privileged patient information, that she obtained during her treatment of A.S. Appellant asserts that counsel's performance was deficient because she failed to recognize that "a clear conflict existed" and attempted to use privileged information obtained through her professional relationship with A.S. to impeach her.

An actual conflict of interest which adversely affects a lawyer's performance is one way in which a counsel's assistance may be rendered constitutionally ineffective. *Strickland*, 466 U.S. at 684–85; *Petetan v. State*, — S.W.3d —, No. AP-77,038, 2017 WL 915530, at *42 (Tex. Crim. App. Mar. 8, 2017), *reh'g granted on other grounds*, No. AP-77,038, 2017 WL 4678670 (Tex. Crim. App. Oct. 18, 2017); *Routier v. State*, 112 S.W.3d 554, 581 (Tex. Crim. App. 2003). To prevail on an ineffective-assistance claim due to a conflict of interest, an appellant must show that trial counsel had an actual conflict of interest, and the conflict actually affected the adequacy of counsel's representation in specific instances. *Cuyler v. Sullivan*, 446 U.S. 335, 349 (1980); *Odelugo v. State*, 443 S.W.3d 131, 136 (Tex. Crim. App. 2014); *Acosta v. State*, 233 S.W.3d 349, 356 (Tex. Crim. App. 2007); *Ex parte Morrow*, 952 S.W.2d 530, 538 (Tex. Crim. App. 1997). An

"actual conflict of interest" exists "if counsel is required to make a choice between advancing his client's interest in a fair trial or advancing other interests (perhaps counsel's own) to the detriment of his client's interest." *Acosta*, 233 S.W.3d at 355 (quoting *Monreal v. State*, 947 S.W.2d 559, 564 (Tex. Crim. App. 1997)); *accord Odelugo*, 443 S.W.3d at 136.

Nothing in the record demonstrates an actual conflict of interest as outlined in *Acosta*. In fact, contrary to advancing another's interests to the detriment of appellant, it appears from the record that counsel was attempting to advance appellant's interests over those of her former patient. While the record fails to show the nature of the information that counsel sought to use, the record suggests that counsel was attempting to use the privileged information to explain why A.S. would have inserted appellant's semen insider of her in an attempt to impregnate herself. Such information would have bolstered A.S.'s credibility concerning her explanation of how appellant's DNA came to be inside her and, thus, would have reinforced appellant's defensive theory that he did not sexually assault A.S. because he did not contact or penetrate her sexual organ with his sexual organ. Because the record reflects that counsel attempted to use the information at issue for the benefit—not the detriment—of appellant, we cannot conclude that counsel's prior professional relationship with A.S. constituted an actual conflict.[16] At best, appellant's claim raises the possibility of a conflict of interest. However, "[t]he possibility of conflict of interest is insufficient to impugn a criminal conviction; a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler*, 446 U.S. at 350; *accord Routier*, 112 S.W.3d at 582. Thus, in this

---

[16] We express no opinion regarding whether counsel's attempt to use the privileged patient information of a former patient for the benefit of her client violated ethical standards of the nursing profession.

case appellant must show that counsel actually acted on behalf of those other interests—that is, A.S.'s interest—during the trial. *See Odelugo*, 443 S.W.3d at 136 ("[T]he appellant must show that his trial counsel had an actual conflict of interest, and that the conflict actually colored counsel's actions during trial." (quoting *Acosta*, 233 S.W.3d at 356)). In the circumstances present here, appellant has failed to make such a showing.

Finally, appellant cites the inexperience of one of his trial attorneys as his last claim of deficient performance, asserting that counsel "was not in a position in which she should have been trying serious felony cases that put [appellant's] liberty at stake" because this was counsel's first criminal jury trial. Essentially, appellant urges us to assume that simple inexperience with a particular proceeding (here, a criminal jury trial) constitutes deficient performance. We decline to do so. The record reflects that the complained-of counsel indicated that she was a criminal defense attorney for 27 years, but simply had not participated in a criminal jury trial. The record does not indicate whether she had participated in criminal bench trials (or how many) or whether she had participated in civil jury trials (or how many). Moreover, the record shows that the complained-of counsel enlisted the assistance of two other attorneys, one of whom, the record indicates, was an experienced criminal defense attorney.[17] We cannot conclude that the inexperience of one of his three trial attorneys regarding a particular proceeding resulted in deficient performance by defense counsel.

Deficient performance means "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. A

---

[17] The record does not indicate the level of experience of the third attorney.

47

reviewing court must apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance. *Id.* at 689. "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citing *Strickland*, 466 U.S. at 690). We conclude that appellant has failed to demonstrate deficient performance on the part of his trial counsel.

Because appellant failed to meet his burden on the first prong of *Strickland* concerning prejudice, we need not consider the requirements of the second prong—prejudice. *Lopez*, 343 S.W.3d at 144; *see Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009) ("An appellant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other prong."). Nevertheless, we also conclude that appellant failed to demonstrate that he suffered prejudice as a result of trial counsels' alleged errors.

Even if an appellant shows that particular errors of counsel were unreasonable, he must further show that they actually had an adverse effect on the defense. *Strickland*, 466 U.S. at 693–95; *Villalobos v. State*, No. 03-13-00687-CR, 2015 WL 5118369, at *2 (Tex. App.—Austin Aug. 26, 2015, pet. ref'd) (mem. op., not designated for publication); *Cochran v. State*, 78 S.W.3d 20, 24 (Tex. App.—Tyler 2002, no pet.); *see Strickland*, 466 U.S. at 691 ("An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."). It is not sufficient that a defendant show, with the benefit of hindsight, that his counsel's actions or omissions during trial were of questionable competence. *Lopez*, 343 S.W.3d at 142–43. Further, merely showing that the errors had some

conceivable effect on the proceedings will not suffice. *Strickland*, 466 U.S. at 693; *Ex parte Martinez*, 330 S.W.3d 891, 901 (Tex. Crim. App. 2011). Instead, he must prove that counsel's errors, judged by the totality of the representation—not by isolated instances of error or by a portion of the trial—denied him a fair trial. *Strickland*, 466 U.S. at 695.

In his argument regarding prejudice, appellant asserts that "it cannot be reasonably disputed" that trial counsels' failure to object to the erroneous sexual-assault venue instruction in the jury charge "significantly lowered the State's burden [of proof], by allowing the jury to find [appellant] guilty without [the State] proving that the alleged [sexual-assault] offense occurred in Hays County." Though not expressly stated, appellant implies that the failure of counsel to object to this alleged "lowering of the burden" caused him prejudice. We concluded in our discussion of appellant's first point of error that the erroneous sexual-assault venue instruction did not cause appellant egregious harm. For similar reasons, we conclude that trial counsels' failure to object to the erroneous jury-charge instruction did not cause prejudice to appellant. The record contains ample evidence that appellant engaged in sexual intercourse with A.S.—including appellant's admissions that he had sexual intercourse with her and his DNA inside of her—in an unknown Texas county. The jury charge included instructions pursuant to the article 13.19 venue provision, which applied given the uncertainty concerning where the sexual-assault offense occurred, and the evidence was sufficient to support an affirmative venue finding under this provision. Accordingly, given the record here, appellant has failed to show that trial counsels' failure to object to the erroneous jury-charge instruction actually had an adverse effect on the defense. *See Strickland*, 466 U.S. at 693–95.

49

Appellant claims that "trial counsel was not prepared for trial in a multitude of respects." Thus, even as he acknowledges that he was acquitted on the compelling-prostitution charge, he contends that had he "had trial counsel that had even a small amount of trial experience, and [was] prepared for trial, he may very well have received a not guilty from the jury on his other two charges as well." This contention is mere speculation without support in the record.

Appellant further argues that this Court should find prejudice because the cumulative effect of trial counsels' alleged errors caused "a breakdown in the adversarial process." We disagree. An accused is not entitled to entirely errorless representation, and we look to the totality of the representation in gauging the adequacy of counsel's performance. *Frangias*, 450 S.W.3d at 136. Appellant was represented by three attorneys at trial, who each actively participated in his representation.

During voir dire, trial counsel questioned the members of the jury panel regarding their ability to serve on the jury: they discussed important legal concepts such as the State's burden of proof, the meaning of "beyond a reasonable doubt," and appellant's Fifth Amendment right not to testify; they explored possible bias or preconceptions regarding issues factually relevant to the case such as gang membership, drug or alcohol use, and stereotypes based on appearances; and they examined the jurors' views concerning concepts such as individual choice, personal accountability, and the ability to change character. At the conclusion of jury selection, counsel successfully challenged panel members for cause and, the record indicates, proficiently exercised peremptory challenges against panel members potentially unfavorable to the defense.

Further, the record shows that, throughout trial, counsel ably presented and developed the defense theories, which involved attacking the credibility of Torres's version of the events, emphasizing the biased and incomplete nature of the police investigation, and presenting an alternative explanation for the presence of appellant's DNA in A.S.'s vagina. In support of these defenses, trial counsel emphasized, through cross examination of the State's witnesses, the weaknesses in the State's case, the flawed police investigation, the lack of corroborating evidence for the robbery, and the bias and lack of credibility of the State's witnesses. Counsel also attempted to minimize appellant's involvement in the robbery and provide an alternative explanation for the presence of appellant's DNA inside A.S. Further, counsel attempted to demonstrate through cross examination of Detective Elrod that appellant's incriminating statements were involuntary.

During closing argument, trial counsel discussed the State's failure to meet its burden of proof; the weak nature of the evidence against appellant concerning the robbery, including the inability of Torres to identify appellant as the perpetrator despite appellant's obviously tattooed (and therefore memorable) appearance; the plausibility of A.S.'s explanation for the presence of appellant's DNA inside her; the involuntary nature of appellant's incriminating statements to Detective Elrod; the impact of drugs and alcohol on appellant's conduct at the time of the offenses and his subsequent incriminating statements to the detective; and the credibility (or lack thereof) of Torres and A.S. as well as the inconsistencies and inaccuracies in their testimony. The record reflects that trial counsels' strategies ultimately proved successful as to the compelling-prostitution charge, as appellant was acquitted of that charge. The fact that the strategies proved unsuccessful

51

as to the other two charges—or that appellate counsel disagrees with them—does not render trial counsels' assistance ineffective.

Finally, during the punishment phase, trial counsel challenged the evidence of appellant's prior convictions, disputed his gang affiliation, and presented evidence focusing on the positive role appellant has in his family.

On the record before us, appellant has failed to demonstrate deficient performance on the part of his trial counsel or that he suffered prejudice because of the alleged errors of counsel. Thus, he has not shown himself entitled to reversal based on ineffective assistance of counsel. We overrule appellant's fourth point of error.

## CONCLUSION

Having concluded that the evidence was sufficient to support an affirmative venue finding, that the complained-of jury-charge error did not cause appellant egregious harm, that the trial court did not abuse its discretion in denying appellant's motion to suppress, and that appellant failed to demonstrate that he received ineffective assistance of counsel, we affirm the trial court's judgments of conviction.

_____

Cindy Olson Bourland, Justice

Before Justices Puryear, Field, and Bourland

Affirmed

Filed:   October 5, 2018

Do Not Publish

53